# EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES v. THULEMEYER, INSURANCE COM'R.

(No. 1875; December 17, 1935; 52 Pac. (2d) 1223)

(Petition for rehearing denied February 18, 1936)

64

See

54 Pac. (2d) 896.

For the plaintiff in error there were briefs by *Alexander & Green,* of New York City; *N. E. Corthell,* of Laramie and *John U. Loomis,* of Cheyenne, and oral arguments by *Messrs. Corthell* and *Loomis.*

66

68

For the defendant in error there was a brief by *Ray E. Lee,* Attorney General, and *James A. Greenwood,* Special Counsel, of Cheyenne, and oral arguments by *Messrs. Greenwood* and *Thomas F. Shea,* Deputy Attorney General.

70

*Alexander & Green, N. E. Corthell* and *John U. Loomis* in reply.

BLUME, Justice.

The plaintiff, the Equitable Life Assurance Society, sometimes called herein the insurer or Society, is a corporation organized in the State of New York, and was at the time of the commencement of this suit, and has been since, licensed to do business in the State of Wyoming, and judging from the allegations in the petition, transacted a large amount of business therein. This action was brought to enjoin the State Insurance Commissioner of this state from revoking such license, which the commissioner threatened to do on October 31, 1931, unless the plaintiff paid a tax of $2\frac{1}{2}\%$ on the premiums received by it since 1917, amounting to about $18,000, on certain group insurance policies, or contracts, in so far only, however, as the premiums were received on insurance of persons resident in this state, one of the policies insuring the employees of the Union Pacific Railroad company, which is authorized to do business in the state, and whose lines traverse this state, and other states, and whose general offices are at Omaha, Nebraska; the other insuring the employees of the Oregon Short Line Railroad company, which is authorized to do business in this state, and part of whose lines of railroad are within this state, and whose general offices are at Salt Lake City, Utah. These companies will frequently be referred to as the employers. The master policies of group insurance in question here were first written in

1917, and the contracts with reference thereto, together with the modifications thereof or supplements thereto, were entered into in the state of New York, by and between the plaintiff and the respective employers, without any participation on the part of any of the employees. Both policies are substantially alike, so that reference to them will, unless otherwise specified, include reference to both. The policies are on the non-contributory plan—that is to say, the employers pay all the premiums, without direct contribution on the part of the employees. In 1924, however, a change was made in the policy of the Union Pacific Railroad company, not of great importance here, whereby in certain instances some of the employees would contribute to the insurance, if over and above the sum of $2500.00. The plan of group insurance is based on the theory of averages; within a given group there will exist a number of weaker lives which will be offset by a number of the stronger lives, and within a given group, the average age in spite of its shifting character will maintain a fairly constant age distribution within reasonable limits. Rates, however, are adjusted from time to time, according to the average increases or decreases. The employers perform all the administrative duties in connection therewith, which would otherwise have to be performed by the insured; there is a saving of commissions and other expenses, and the result is that the premiums for the insurance are considerably less than the premiums payable on ordinary policies. The employers may discontinue the insurance at any time, without consulting any employee, and the policies will lapse upon failure of the premiums, which are due monthly, are payable in New York, and which have always been remitted by the respective employers from their general offices. The master policies provide that employees insured are "those enumerated in the record known as the insurance record of said em-

ployer kept by the society," and in it also are designated the names, amount of insurance, etc. It is changed from time to time, as new employees come in or other employees drop out. The employee executes—ordinarily at least—in order that his name may appear on the register, a statement, containing his name, residence, employment, sex, name of beneficiary, etc. This is sent to the employers, and they thereupon send the necessary information to the insurer. Each of the master policies provides that it, together with the application of the employer, and the individual applications, if any, shall constitute the entire contract—a provision which is like that provided for such policies by the laws of the State of New York.

In addition to the master policies, this case involves, though to a small extent, policies on the contributory plan, under which those, insured under the master policies, may, at their own expense, have additional insurance, upon their direct application to the insurer, provided that 75% of the employees eligible, elect to come under such plan. The insurance thereunder ends when the employment under the employer ends, a provision also contained in the master policies. Other pertinent matters will be mentioned, or enlarged upon later.

The trial court held the tax demanded by the insurance commissioner to be valid, dissolved the temporary injunction theretofore issued, and adjudged that the insurance commissioner had the right to cancel plaintiff's license unless the tax was paid. From this judgment the plaintiff has appealed.

1. In 1897 the legislature passed what is now Section 115-117, Rev. St. Wyo. 1931, reading in part:

"There is hereby imposed and levied upon each and every insurance company transacting the business of insurance within the state, a tax of two and one-half

per centum per annum upon the gross premiums received by it for insurance within this state."

In 1935 (Chap. 48, S. L. 1935) this statute was amended so as to read in part:

"Every * * * company authorized to do an insurance business in this state, except fraternal benefit associations or societies, shall pay an annual state tax for the privilege of doing an insurance business in this state, equal to two and one-half per centum on the gross amount of premiums received during the preceding calendar year on contracts covering risks within this state."

The law of 1935 above quoted expressly declares that the tax is one for the privilege of doing business in this state, and it undoubtedly is so. We think the tax imposed under the original law is one of the same character. A license has been, and is now, required of insurance companies to do business in this state, being renewable each year, and running from March 1st of one year to March 1st of the next. The original act provided that "the failure to pay such tax shall prevent the delinquent insurance company from transacting any business in the state, and upon the failure or refusal to pay the same within the time limited in this section, the insurance commissioner shall revoke the authority or license of such company to transact business within the state." A like provision is contained in the amended act. So we think that the tax provided by Sec. 115-117, as originally enacted, also is a privilege or franchise tax, and the authorities sustain that view. 61 C. J. 310; 26 R. C. L. 35. This point, however, considering the case as a whole in its ultimate aspects, is of minor importance.

Looking to substance, rather than form, the main and basic question raised herein, and the one of greatest importance to the state in the long run, is whether, in taxing the plaintiff for the privilege of doing busi-

ness in this state, the premiums paid to plaintiff on the group insurance policies here involved, so far as residents in this state are concerned, may, assuming proper legislation, be taken as the basis of the tax along with other premiums paid, without violating the state's constitutional provision relating to due process, or the 14th amendment to the Federal constitution. If it may be, the insurance commissioner is authorized to revoke plaintiff's license for non-payment thereof; if not, he cannot do so. We need not discuss the state and federal provisions separately, and the construction placed on the amendment to the Federal constitution relating to due process must be the construction placed on the provision of our own constitution in that connection. It is well settled that a state has the right to exclude a foreign corporation altogether from her territory or jurisdiction, or determine the conditions on which the entry shall be made or continued, subject, however, and only, to the paramount authority of the Federal constitution, and the amendments thereof. Hooper v. California, 155 U. S. 648, 39 L. Ed. 297, 15 Sup. Ct. 207; Hanover Fire Insurance Company v. Carr, 272 U. S. 494, 47 Sup. Ct. 179 and cases cited; 7 Enc. of U. S. Supreme Court Reports 80, 81. The question therefore is as to whether or not the tax violates the rights granted under the Federal constitution or the 14th amendment, to the citizens of the United States. The laws of this state, and the acts of the insurance commissioner, do not violate the interstate commerce clause, since it has often been decided that insurance business is not interstate commerce. New York Life Ins. Co. v. Deer Lodge County, 231 U. S. 495, 34 S. Ct. 167, 58 L. Ed. 332; Nat. Union Fire Ins. Co. v. Wanberg, 260 U. S. 71, 43 S. Ct. 32, 67 L. Ed. 136; Bothwell v. Buckbee-Mears Co., 275 U. S. 274, 48 S. Ct. 124. Nor is it argued that the plaintiff does not enjoy the equal protection of the laws of this state,

inasmuch as all corporations doing insurance business herein, including domestic corporations, except fraternal insurance companies, are all alike required to pay the tax on the premiums mentioned in the law.

The contentions made herein are that the tax in question interferes with the right of contract, and that it is attempted to tax property not within the jurisdiction of the state. The main cases as to the first of the contentions of counsel are Allgeyer v. Louisiana, 165 U. S. 578, 17 S. Ct. 427, 41 L. Ed. 832; St. Louis Cotton Compress Co. v. Arkansas, 260 U. S. 346, 43 S. Ct. 125, 67 L. Ed. 297; and the first part of Compania General de Tobaccos v. Collector, 275 U. S. 87, 48 S. Ct. 100. In the latter case Mr. Justice Holmes and Mr. Justice Brandeis dissented as to the first part thereof. In these cases it was held that a state or territory cannot prohibit or interfere by penalty or tax with a valid contract made outside of the state with an insurance company not within the jurisdiction of the state and transacting no business therein, though the property insured is temporarily within the state, or territory. And in the St. Louis Cotton Compress Co. case, written by Mr. Justice Holmes, it was said that "It is true that the state may regulate the activities of foreign corporations within the state, but it cannot regulate or interfere with what they do outside." But the facts in these cases differ materially from those involved herein. The statement made in the St. Louis Cotton Compress Co. case, that the state cannot regulate or interfere with what parties do outside, must be understood and construed in the light of the facts, and it is significant in that connection that the opinion was written by the same justice who wrote the opinion in Equitable Life Assur. Soc. v. Pennsylvania, 238 U. S. 143, 35 S. Ct. 829, 50 L. Ed. 123, hereinafter mentioned. The state does not in any way attack the validity of the contracts involved here-

in. The privilege tax in question affects or interferes with contracts made in a foreign jurisdiction in a certain sense, but not every interference makes a tax invalid. If it did there would be few, if any, life insurance companies which would not easily be able to evade taxes in foreign jurisdictions. The interference mentioned in the Allgeyer, St. Louis Compress Company, and Compania General de Tobaccos cases is the interference under the conditions therein mentioned. In the case at bar, this state has jurisdiction over all the parties interested. The plaintiff regularly transacts business within its borders. The state has a right to tax it and make exactions for doing business therein; the tax in question here is but a part of the whole, and bears a reasonable relation to the business done here by the plaintiff. The mere fact that a contract is a foreign contract is not controlling. Bothwell v. Buckbee-Mears Co., supra; New York Life Ins. Co. v. Deer Lodge County, 231 U. S. 405, 34 S. Ct. 167, 58 L. Ed. 532. In the latter case it was held that a life insurance company, admitted to do business in Montana, whose manner of business is such that all risks are accepted and all contracts made, modified and discharged at its home office in New York, and the premiums of which are transmitted to such office, may be subjected to an annual tax into whose computation enters such foreign contracts. A good case in point, we think, is the case of State ex rel. v. Tomlin, 101 O. S. 459, 120 N. E. 684. In that case the relator, a foreign corporation, was licensed in Ohio to write casualty insurance, but not liability insurance. It made a contract in New York for re-insuring other companies against a portion of their liability on risks which were located in Ohio. The laws forbade such contracts unless bonds in the sum of $50,000 were deposited with the superintendent of insurance. A similar contention was made as here, but the court said:

"We do not have the situation arising in the reported case of Allgeyer v. Louisiana, 165 U. S. 578. If it be conceded that the state might not interfere with an insurance contract made in a foreign state by a foreign company, non constat that the state may not impose conditions under which such foreign and alien company may be permitted to do insurance business in Ohio. We have not the question of contracts before us. In that respect nothing is claimed. The state simply says in effect 'you must comply with our laws, if you seek a license to do insurance business here.'"

The only distinguishable feature between that case and this, is that in that case bonds of $50,000 were demanded, while in this case the state demands money. The difference, it would seem, is of no importance.

The cases which, as we think, are in point and controlling herein are Equitable Life Assur. Soc. v. Pennsylvania, 238 U. S. 143, 35 S. Ct. 829, 50 L. Ed. 1239, and the second part of Compania General de Tobaccos v. Collector, supra. In the first of these cases a tax was assessed on premiums received by an insurance company, licensed to do business in Pennsylvania, on policies of life insurance held by residents of the state, but judging from the dissenting opinion of the lower court (239 Pa. St. 288, 294) were originally issued to non-residents of Pennsylvania, and the premiums were paid in New York. In the second of these cases, the insured, a company in Spain, had a licensed agent in the Philippine Islands, and had property therein, stored, and intended to be shipped. The agent advised the company in Spain of the value of the property stored, and the company in Spain then caused the property insured in a London Company, licensed to do business in the Philippine Islands. A tax was sought to be collected on the premium received by the insurance company on that policy. In both of these cases the validity of the tax was upheld. In the Pennsylvania case, the court said in part:

"These are policies of life insurance, and, according to the statement of the plaintiff in error, are kept alive and renewed to residents of Pennsylvania by payments from year to year. The fact that the state could not prevent the contracts, so far as that may be true, has little bearing upon its right to consider the benefit thus annually extended into Pennsylvania in measuring the value of the privileges that it does grant. We may add that the state profits the company equally by protecting the lives insured, wherever the premiums are paid. The tax is a tax upon a privilege actually used. *The only question concerns the mode of measuring the tax.* Flint v. Stone Tracy Co., 220 U. S. 107, 162, 163, 55 L. Ed. 389, 417, 418, 31 Sup. Ct. Rep. 342, Ann. Cas. 1912B, 1312. As to that a certain latitude must be allowed. It is obvious that many incidents of the contract are likely to be attended to in Pennsylvania, such as payment of dividends when received in cash, sending an adjuster into the state in case of dispute, or making proof of death. See Connectict Mut. L. Ins. Co. v. Spratley, 172 U. S. 602, 611, 43 L. Ed. 569, 572, 19 Sup. Ct. Rep. 308; Pennsylvania Lumbermen's Mut. F. Ins. Co. v. Meyer, 197 U. S. 407, 415, 49 L. Ed. 810, 814, 25 Sup. Ct. Rep. 483. It is not unnatural to take the policy holders residing in the state as a measure without going into nicer, if not impracticable, details. Taxation has to be determined by general principles, and it seems to us impossible to say that the rule adopted in Pennsylvania goes beyind what the Constitution allows."

In the Compania case, the court said:

"We come now to the question of the tax upon the premiums paid to the London Company, which was licensed and presumably was doing business in the Philippine Islands. Does the fact that, while the Tabacco Company and the London Company were within the jurisdiction of the Philippines, they made a contract outside of the Philippines for the insurance of merchandise in the Philippines, prevent the imposition upon the assured of a tax of 1 per cent upon the money paid by it as a premium to the London Company? We may properly assume that this tax placed upon the assured must ultimately be paid by the insurer, and

treating its real incidence as such, the question arises whether making and carrying out the policy does not involve an exercise or use of the right of the London Company to do business in the Philippine Islands under its license, because the policy covers fire risks on property within the Philippine Islands which may require adjustment and the activities of agents in the Philippine Islands with respect to settlement of losses arising thereunder. This we think must be answered affirmatively under Equitable Life Soc. v. Commonwealth of Pennsylvania, 238 U. S. 143, 35 S. Ct. 829, 59 L. Ed. 1239. The case is a close one, but, in deference to the conclusion we reached in the latter case, we affirm the judgment of the court below in respect to the tax upon the premium paid to the London Company."

Before proceeding further, we should call attention to the case of Provident Sav. L. Assur. Soc. v. Kentucky, 209 U. S. 103, 36 Sup. Ct. 34; 60 L. Ed. 167. In that case, the Supreme Court of Kentucky had held that an insurance company could be compelled to pay a tax on premiums paid on life insurance contracts held by residents of Kentucky even after the company had withdrawn from the state and ceased to do business therein. The Federal Supreme Court, in holding otherwise, and in differentiating that case from Equitable L. Assur. Co. v. Pennsylvania, supra, said that the tax in the latter case was a tax upon a privilege actually used, and that the only question concerned the mode of measuring the tax, while in the case then in hand the point in controversy was not the measure of the tax in doing business, but the very basis of the tax —that is, whether the company was doing business in the state. Hence the not unfair conclusion may be drawn from that case that if an insurance company actually transacts business in the state—as is unquestioned in the case at bar—premiums paid on life insurance in favor of residents of this state may, because of such residence, be taken into consideration in meas-

uring the tax. The protection furnished such residents, as well as the right to do business in the state, furnish the *quid pro quo* for such a tax. Mr. Justice Taft, in Compania General de Tobaccos v. Collector, supra, in speaking of the Pennsylvania case, supra, said that the latter case could not be construed as holding that the protection extended by the state to the insured was alone sufficient to uphold the tax there in question, but that the case "turns entirely on the fact that the tax payer had subjected itself to the jurisdiction of Pennsylvania in doing business there, and it was for the state to say what the condition of its doing that business in the matter of the payment of taxes should be." That statement, it may be noticed, is in accord with our conclusion drawn from Prov. Sav. Assur. Co. v. Kentucky, supra, and if that construction is correct, and the case is followed, the plaintiff's claim as to the unconstitutionality of the tax involved herein is utterly futile. It may be, however, that this construction is too favorable to the defendant herein. We gather this from the further statement of Mr. Justice Taft, in the case above mentioned, and from other cases, that the effect of the Allgeyer and St. Louis Compress Co. cases is that "as the state is forbidden to deprive a person of his liberty without due process of law, it may not compel anyone within its jurisdiction to pay tribute to it for contracts or money paid to secure the benefit of contracts made and to be performed outside of the state." The extent of performance is not stated, and it is clear, we think, considering the various decisions, that the statement of Mr. Justice Taft refers only to cases where contracts are wholly performed outside of the state, and not to cases where there is, or is likely to be, at least partial performance within the state. It was said in Southern Realty Corporation v. McCallum, 1 Fed. Supp. 614, 616, that "treating the exaction of the law as a privilege tax, it

is valid so long as it bears some real and reasonable relation to the privilege granted or to the protection of the interests of the state." The case, it is true, involved the equality clause of the fourteenth amendment, but the Pennsylvania case, supra, appears to express the same thought, finding that reasonable relation in the fact that the insurance company has submitted itself to the jurisdiction of the state, the protection and privilege extended by the state, and that some incidents arising out of the contract, the premium of which is sought to be taxed, are likely—not necessarily—to be performed in the state. In the Compania General de Tobaccos case, it is stated that—aside from the question of jurisdiction—all that is necessary is that the exercise of the privilege granted to the state may require adjustment and the activities of agents in the state with respect to settlement and losses arising under the insurance. It may be noted that it does not mention steps towards performance taken by the insured, which are mentioned in the Pennsylvania case. We take it, however, that the latter case was not intended to be modified in that respect. In any event, the case at bar comes, we think, within what was said in either of these cases.

Admitting, then, for the purposes of this case, that a state cannot interfere, by the imposition even of a privilege tax, with a contract made and to be wholly performed outside of this state, even though it affects citizens in this state, still that is not the situation here, though counsel for plaintiff claim the contrary. They contend and it was pleaded that no incidents of the contract have been performed in this state, except some of no importance. It is alleged in the petition "that any such matters performed within the state of Wyoming consist merely of certain details connected with the statements of employees who may be at the time within Wyoming who are desirous of coming

within the group of insured employees and statements and papers connected with proofs of claim for death or disability on behalf of such employees." It would seem that this admission in the pleadings is sufficient to show that the case should be governed by the Pennsylvania case and the second part of the Compania General de Tobaccos case, supra. But we shall discuss this subject further. Counsel for plaintiff apparently claim that all the incidents to be performed in this state must be essential parts of the contract. But that is, we think, erroneous. The question should rather be as to whether or not they would fairly arise out of the contract. And counsel, we think, are mistaken in their conclusions touching these incidents. They say, for instance, that no investigation, settlement or adjustment was necessary here, since the insurer recognized any claim made by the employer, and whatever investigation was made, was made by the railroad company. But that was necessarily the insurer's business, though performed on its behalf by the railroad company. Whatever truth there is in counsel's statement arises out of the fact, that, as stated by the witness Stegg, "in paying the claim we relied on the good faith and integrity of the employer." But it was not required to do so and it might not do so in all cases, and that it has not done so in all cases seems to be shown by Hamblin v. Equitable Assur. Soc., 124 Nebr. 841, 248 N. W. 397, which arose under the identical policy here involved, and in which the insurer must have made an exhaustive investigation in the state of the residence of the insured in connection with the payment of the claim. See also Peyton v. Metropolitan L. Ins. Co., 177 La. 568, 148 So. 721. The policy terminates as to the insured whenever his employment with the railroad company ceases, and the insurer might not always want to rely upon the statement of the employer. Certainly the policy in question does not forbid its own

investigation. The right to do so naturally arises out of the policy in question, and must be regarded as an implied provision thereof. That is true also with regard to adjustments and settlements of claims under it, for the insurer will, according to the provisions thereof, pay claims only "upon due proof" which in the absence of a provision to the contrary, necessarily refers to the insurer. Further, the policy provides for a report by the railroad company to the insurer of the employees embraced within the policy. To enable the railroad companies to do this, they require from the employees on form No. 5090 a statement as to age, sex, place of birth, name of beneficiary, etc., together with an agreement that the insurance shall cease when the employee ceases to be an employee—a provision also inserted in the policies issued. It is shown that these statements are kept in the office of the railroad company, and that it has not been treated as essential to the validity of the insurance. But it is, at least, an incident of the contract; it is material; the rates are based partially upon the ages of the insured; the statement is, accordingly, likely to be called for, and has in fact been called for in all but exceptional cases, and it is made out, of course, as a rule in any event, in this state, so far as the insured are residents thereof. Again the insurance company issues, under its contracts, and sends to the employer, *for delivery to the employees,* an individual certificate showing the insurance held by the latter. This is claimed not to be essential to the validity of the insurance, and that in exceptional cases it is not delivered to the insured. But the contract in question has itself made this certificate an incident thereof; the delivery thereof is likely to be performed within this state in so far as resident employees are concerned, and it substantially takes the place of the delivery of the ordinary policy. Further, the contract provides that changes in the group of employees shall

be reported, and the "insurance covering such changes
as evidenced by the Society's certificates to the em-
ployees affected, and the premium adjustment corre-
sponding to the changes, shall become effective from
the date of such changes." Here the incident connected
with the contract performed in this state, consists in
part, at least, of the fact that individuals enter or
withdraw from the railroad company's service. So the
separate policies, for additional insurance, are inci-
dental to the master group policies, for they are based
on the latter, are stated to be supplemental thereto and
end with it. They are issued in favor of those who
elect to come under them, and every employee may do
so by a writing filed with the society, and the applica-
tions to do so, in whatever form they may be, are un-
doubtly ordinarily made in this state on the part of
the employees herein. Further, the contracts provide
that an employee within 31 days after ceasing to be
employed by the railroad company, may *upon applica-
tion made to the society*, without examination as to
his insurability, have an individual policy issued to
him, upon the payment of the premium applicable to
such policies. In such case an essential step toward
performance is taken in this state as to employees
resident therein—a step which is at least an incident
of the contracts involved herein. Again, the main pol-
icies provide that if an employee shall furnish *the
society* with due proof that he has become wholly dis-
abled, the society will, at the option of the employer,
pay such disability in five annual installments. This
also is an incident of the contracts, and it is needless
to say that the initiation of the performance thereof
on the part of the employees in the state would ordi-
narily and almost necessarily originate therein. More-
over, an employee may, according to the contracts,
change the beneficiary by a written request, upon the
society's blanks, filed at its home office, and presuma-

bly sent by the employees in this state from the place
of their residence. By an amendment of the contracts,
made in 1926, the notice of the change is sent to the
employers. But this does not, we think, materially
alter the situation. The employment of employees in
this state is in fact itself an incident of the contract,
performed in this state, and contemplated by the con-
tract. And the insurance issued by the insurer to pro-
tect the employees resident in this state is of exactly
the same general nature as ordinary policies, and may
well be said that such business is part of the business
of the insurer in this state, in so far as the employees
located here are concerned. Were it not for these em-
ployees, its premium under the contracts would be
proportionately less. And while the employees may be
shifted from place to place, and from this state to an-
other, others, who come within the contemplation of
the contracts, will, from time to time, replace them, in
order that the railroad companies may properly per-
form their business in this state. This is sufficient, we
think, to show that many and important incidents of
the contracts are likely to be performed within this
state.

Counsel for plaintiff, further, strenuously insist that
the premiums paid on group insurance stand upon an
entirely different footing from premiums paid on other
insurance. Group insurance, of course, is somewhat
*sui generis*, and differs in many respects from other
insurance. Still the differences have, we think, been
exaggerated by counsel in so far as constitutional
questions are concerned. In both group and other life
insurance is found the one and main essential thing,
namely, that the insurer insures another against death
or accident for a consideration. The remittance for
premiums, it is pointed out, have been made from
Omaha or Salt Lake City. But we think that immate-
rial. The contracts have no provision concerning it.

The place from which the remittance is made seems, so far as this case is concerned, to be of no greater importance than the place where it is received, and that seems to be implied in the holding on the second point involved in Compania General de Tobaccos v. Collector, supra. The money necessary to be paid is gathered in from the various places traversed by the railroads, and collected together in Omaha and Salt Lake City merely for convenience. Nothing would forbid the payment in this state.

Again counsel say that the contract was made solely between the employers and the insurance company. But we are unable to see how that fact can deprive the state of the privilege tax which it has the right to exact from the insurer. So far as the latter's duty to pay a tax is concerned, the fact that the contract was negotiated by and signed by the employers can make no difference. It was made to insure certain lives for a consideration, and if that consideration may otherwise be subjected to a tax, the fact that a third party was one of the parties to the contract can have no bearing thereon. Moreover, as between the employers here and the employees, the latter are the main and real parties in interest. The interest of the employers is but indirect. Peyton v. Metropolitan Life Ins. Co., 177 La. 568, 148 So. 721; Hamblin v. Equitable Life Assur. Soc., 124 Nebr. 841, 248 N. W. 397; Couch, Ency. of Insurance, Vol. 8, Sec. 2094. As was well said by Prof. Hanft in Law and Contemporary Problems, January, 1935, p. 85:

"The view that the employee is not a party to the contract, takes little account of the nature of group insurance. It is true that the individual employees do not bargain with the (insurance) company in persons, but they do so through the medium of the employer. The object of the negotiating and of the insurance documents is to insure them, not the employer."

Again, it is argued that the premium is paid by the employers. But we cannot see what necessary bearing that has on the question before us. Numberless ordinary policies are issued on the lives of individuals, for the protection, for instance, of a creditor, where the latter pays the premiums and attends to the details in connection with the policy which would otherwise have to be attended to by the insured. The ordinary rule is that premiums may be paid by anyone. 32 C. J. 1197. In this case, such payment is but one of the many incidents connected with and arising out of the contracts. Moreover, it is not a violent presumption that the money paid by the employers for insurance of residents of this state originated in this state, and was earned in the business of the employers therein, by the aid of these employees; that it is not a gratuity, but is paid because it is for the best interests of the employers, even though also for the best interests of the employees, and this in fact is pleaded and admitted in evidence. As was said by Prof. Hanft in the article already mentioned, page 85:

"Even where the employer pays all the premiums, he usually does it in order to obtain some advantage from the employees, such as reduction in labor turnover, more loyalty and co-operation, etc. The insurance is part of that which the employee receives for his labor. Thus consideration is furnished in service for the employer, who passes the consideration on to the company in form of money."

The case before us, then, is, we believe, in all essentials like the Pennsylvania case, and the second part of Compania General de Tobaccos case—a privilege tax, jurisdiction over all the interested parties, a privilege used by actually transacting business in the state, protection by those insured under the policies, close relationship of the premiums in question to the other premiums received by the insurer in this state, and to

the business transacted therein, and many and important incidents of the contracts which are likely to be performed here. We are here dealing with a privilege tax, not a property tax. If we admit that the premiums received on the group policies in question could not of or by themselves be taxed, still it has repeatedly been held by the Federal Supreme Court that there may be included in a license tax income which of itself is not taxable. Flint v. Stone Tracy Co., 220 U. S. 107, 31 Sup. Ct. 343, 353, 354, and cases cited. The tax here is not a direct tax on the premiums paid, so as to be considered as a tax on property not within the state. It is only part of the measure of what the state wants for the privilege of doing business therein. If it were to demand a fixed amount of money which would be the equivalent to that which the state demands now in the name of a privilege tax, no one would claim that to be invalid. That, in substance, is what the state asks. The word "tax" should not mislead. It might well have been omitted from the acts. The substance of the legislation on its face is that insurance companies shall annually pay for the privilege of doing business in this state a sum equal to or measured by $2\frac{1}{2}\%$ of the premiums received by the insurance companies for risks within this state during the previous year. If the tax in a definite sum, at least if reasonable in amount, would not be condemned, neither can such a measure of the tax, under the facts herein, especially since the state extends equal protection to all the risks within it.

Finally, the impression was sought to be given us on the oral hearing that the very tax which this state is seeking to collect has already been paid and is being paid to the states of Nebraska and Utah. If that were so, we cannot see how that could invalidate the tax in this state. We might say, however, in that connection, without attempting to construe the laws of the states

mentioned, but considering this feature from the standpoint of justice and real comity only—if a tax on such insurance policies can be justified at all—that we cannot see how the states mentioned can have any claim on premiums paid for the employees in this state. They give no such *quid pro quo* for such claim as this state, which protects the employees and their families. We must, accordingly, hold that no constitutional objection exists against the tax in question.

2. It is claimed that the laws of this state, prior to the enactment of chapter 48 of the Session Laws of 1935, did not contemplate the payment of any tax on premiums received on group insurance. The evidence shows that this character of insurance came into existence about 1911. So it is argued that when, in 1897, Sec. 115-117, Rev. St. 1931 was passed, the legislature did not have group insurance in mind, and hence no legislative provision for a tax in connection with such insurance was ever made until 1935. The question is not free from difficulties, and we have been able to arrive at a decision only after the most careful analysis of the facts and the law. If it is correct that the insurance in question came into existence about 1911, then the only reason why a tax of the character in question could be held to be within the act of 1897 is under the rule mentioned in Pellish Bros. v. Cooper, 47 Wyo. 480, 38 P. (2d) 607, namely, that legislative enactments, general and comprehensive in operation, ordinarily apply to all persons, subjects and business within their general purview and scope coming into existence subsequent to their enactment. We said in that case that, perhaps, the rule should not be as broad in the case of a statute, as in the case of a constitutional provision, since the legislature may easily remedy any defects in existing laws. And it is no doubt true that the rule would be more readily applied in the case of a remedial statute, like that involved in

the Pellish Bros. case, than in the case of one penal in character and levying taxes. After all, it is a question of legislative intent. It is said in 59 C. J. 274 that where the statute shows plainly that a term is not used as describing the whole genus put forward as the one applicable to the case, but only some particular species thereof, the rule above mentioned does not apply. And we take it that the rule would be the same if the statutes as a whole, in force at the time, show this to be true. 52 C. J. 1053. We think that, without reference to the point as to when group insurance originated, it can be shown that section 115-117, supra, construed in the light of other laws in force at the time, shows that it was limited in its scope. By chapter 101, Laws of 1890-91, Sec. 1, the legislature enacted in part:

"No life insurance company doing business in this state shall make or permit any distinction or discrimination in favor of individuals of the same class and equal expectations of life, in the amount of payment of premiums, or rates charged for policies of life or endowment insurance or in the dividends of other benefits payable thereon, or in any other of the contracts of insurance it makes, nor shall any such company, or agent thereof, make any contract of insurance or agreement as to such contract, other than as plainly expressed in the policy issued thereon" etc.

This provision was carried forward from time to time, and now appears in the revision of 1931 as section 57-801. The third section of the act related to penalties, and was amended in the legislative session of 1897 by chapter 33 thereof, a few days before the taxing law, now appearing as section 115-117, Rev. St. 1931, was passed. No other provision modifying the quoted part from chapter 101, supra, then existed. Hence the legislature must be held to have had in mind, when it passed Section 115-117, supra, the life

insurance policies mentioned in the act of 1890-1891. That act provides that no distinction in premiums shall be made in favor of individuals of the same class and equal expectation of life. The term "class" refers to individuals, not policies. The evidence shows that in group insurance, the group is taken as a whole, and that the rate is fixed and changed from time to time, according to the average age, and that such insurance is much cheaper than ordinary insurance. A person of a certain class who takes out an ordinary, individual insurance policy pays a premium of a certain amount. The premium payable under a group policy, insuring a person of the same class and age, will be much less. This fact is in direct conflict with the law above quoted. Moreover, in group insurance, such as involved herein, the employer pays the ordinary premiums, while chapter 101, supra, read fairly, contemplates such payment by "individuals." Furthermore, we doubt that a contract for group insurance states the terms of the contract "plainly," as is contemplated by chapter 101, supra. If we leave out of consideration the fact that the name of the insured and the amount for which he is insured plainly appear in the ordinary life insurance policy, but not in a group policy, at least the amount of premiums payable is not "plainly" stated in the contracts. It varies and may be adjusted from time to time, due to extrinsic facts. It depends, as already stated, on the average age of the group, and according to the evidence, the calculation of the monthly premiums is complicated. It would seem, accordingly, that we are forced to the conclusion either that the law of 1897 definitely excluded group insurance from its scope, or that the legislature intended to prohibit such insurance. It is hard for us to accept the second alternative, in view of the benevolent character of group insurance. Besides, the legislature of 1921, while leaving chapter 101, supra, in force, clear-

ly recognized the validity of group insurance and by Section 25, Chapter 142 of the Session Laws of that year, regulated it in part. We think, accordingly, that we should adopt the first alternative.

If, however, a doubt remains on the point in question we may call to our aid the rule that in construing a statute, the contemporaneous construction placed thereon by the executive department of the state having the collection of license fees in charge is of some weight. 59 C. J. 1025. From 1917, when the contracts in question were first written, to 1931, no tax on the premiums connected with the contracts in question was collected or demanded. The defendant argues and pleaded that he did not discover the error in the reports of the plaintiff required to be made annually until September, 1930. The reports made relate to the business of plaintiff in Wyoming. No reports prior to 1921 are in the record. The reports from that year on, to 1927, do not specifically show any group policies in force in this state. But they do show a large amount of losses and claims incurred on account of such policies in Wyoming. The report for 1921, for instance, shows losses on such policies in the sum of $44,224.00; the report for the next year losses of $35,276.00; the report for the following year, losses of $20,706.00. From 1927 on, the plaintiff reported not only the losses, but also the amount in force and the increase in insurance, in connection with group policies. In other words, even though some or all the reports were incomplete, they showed clearly and plainly, without the possibility of misunderstanding, that the plaintiff had group insurance in force in this state, and the very fact of the incompleteness of the reports in connection with group insurance was more likely than anything else to draw the attention of the insurance commissioner to the fact that the relator believed that it was not liable for taxes on the premiums received on such

policies. And the insurance commissioner evidently acquiesced in that belief for many years.

We shall not examine the various reasons that may have been given for the rule now under consideration. One reason, however, would seem to be that the parties interested might incur a detriment by a change in the construction of a statute. Here, for instance, the plaintiff would have made its rates for the insurance in question higher, if payment of the taxes now claimed by the state had been required. It has now no recourse against anyone. While that may not be of great weight, inasmuch as everyone is presumed to know the law, still we cannot, in case of doubt, leave it out of consideration.

Again, in case of doubt, we may look to the change in the language used in chapter 48, Laws of 1935, amending section 115-117. The law passed in 1897 required a tax to be paid on premiums "for insurance within this state." The amendment requires the tax to be paid on premiums received "on contracts covering risks within this state." It cannot be disputed that the amendment is more specific, and in all probability was intended to reach premiums on group policies such as are involved in the case at bar, and we have no doubt that it does so, and this, in fact, is admitted by counsel for the plaintiff. The only question is whether the amendment was intended to make new law, so far as the tax on premiums is concerned, or remove a doubt in the old law on that point. It is said in 59 C. J. 1097 that "it will be presumed that the legislature, in adopting the amendment, intended to make some change in the existing law, and therefore the courts will endeavor to give some effect to the amendment. So a change in phraseology from that of the original act will raise the presumption that a change of meaning was also intended." A legislative construction is

not, of course, binding on the courts. 59 C. J. 1130. Still it is said at the same place that courts are not at liberty to speculate upon legislative intent where the legislature has put its own construction on its prior enactments. In this case the only definite thing we can gather from the foregoing amendment is that the legislature, so far as the point here involved is concerned, was at least in doubt as to the meaning of the prior law. We cannot, as may be gathered from what we have said, do less than concur in that. And it is a general rule that revenue laws—in which doubtless are included laws providing for a privilege tax— will, if they are ambiguous or doubtful, be construed in favor of the tax payer. 59 C. J. 1131. We cannot, accordingly, see how, everything considered, we can escape the conclusion that no tax could be collected on premiums collected on group insurance policies prior to the amendment above mentioned; that such tax can, however, be collected since the passage of the amendment, and that such tax does not violate any constitutional provisions or the amendments thereto.

Other points argued need not be considered, either because that is unnecessary, or because we deem them not well taken.

Our conclusion as to the meaning of the statutes of this state would make it, strictly speaking, unnecessary to decide the constitutional questions herein considered. An appellate court will ordinarily confine itself to the state of the case at the time the judgment is rendered therein. It is said, however, that "sometimes the court will depart from this rule where, by so doing, it can shorten litigation and best subserve the ends of justice." 4 C. J. 1120, 1150, 1151. A departure from the ordinary rules is highly desirable in the case at bar. The amount of the tax demanded is but incidental to the case. It may be gathered from the plaintiff's petition, and it plainly appears from the

argument of counsel, that the claim is that no tax whatever on the premiums paid or payable on the group policies in question can be collected without violating the 14th amendment of the Federal Constitution. If we should not now decide the point, plaintiff could instantly inaugurate another long period of litigation, in order to have the point decided. The suit herein—an injunction suit—was brought, as alleged, to avoid multiplicity of suits. Hence it could not be unfair to consider the act of 1897 as well as the amended act in issue herein. The necessary facts are all before the court. Plaintiff has prayed for all proper relief. Licenses of life insurance companies are annual. The nature of the case is such that the parties are not alone interested as to the law at the time of the commencement of this action, but also as it is now. They will, at each annual license-period, be confronted with the constitutional questions involved herein. We have thought it best, therefore, and the special circumstances of the case seem to require, that we decide them, so that, if the parties desire, and the rules of the Federal Supreme Court permit, the questions arising herein under the fourteenth amendment to the United States Constitution may be decided as speedily as possible by that court. The judgment of the trial court must, accordingly, be modified to conform with this opinion. It is so ordered.

*Modified.*

KIMBALL, Ch. J., and RINER, J., concur.

BLUME, Justice.

A petition for rehearing has been filed herein on behalf of the state insurance commissioner. We think we need to make only a few comments in connection with the claims made therein and in the brief in support thereof. We do not think that any constitutional provisions were violated in holding that no tax on the

premiums received on the policies in controversy could be collected prior to the time that the act of 1935 took effect. Counsel argue that the plaintiff will be the only company which will escape taxation on its policies. A list of taxes paid by other companies on group insurance since 1925 has been submitted to us, and it is also contended in connection therewith that this list shows that the construction of the insurance commissioner put on Sec. 115-117, Rev. St. 1931, enacted in 1897, was exactly contrary to what we held in our original opinion. We do not think so. The list does not show whether the policies on which the tax on the premiums were collected were of the same character as the ones in controversy here. If not, the objections which we urged, on account of Sec. 1, Ch. 101, Sessions Laws 1890-91, might not apply. Further, it does not appear whether or not they were written within the state. If they were, it would, of course, not be surprising that the insurance department insisted upon payment of taxes on such business. If they were not written in this state, then it would seem to follow, either that the departmental construction as to the policies in controversy was as stated in the original opinion, or that there was, if the department construed them the same as the other policies, negligence from the standpoint of the insurance commissioners in not, for so many years, insisting upon payment of the tax. And this is particularly true, because group insurance was recognized by the legislature as early as 1921, and it is even more true if it is correct, as counsel say, that this was not the first legislative recognition. We cannot assume such negligence, and no adequate explanation has been given. The insurance commissioner offered to show in the court below, as we are informed now for the first time, that the construction by the department was in favor of the theory that a tax on the premiums paid on the policies in controversy should be collected. The

offer, however, was indefinite in the same respects as above mentioned.

We referred in the original opinion to the fact that Sec. 1, C. 101, Session Laws of 1890-91, seemed to indicate that section 115-117, Rev. St. 1931 (enacted in 1897), should not apply to policies like those in controversy. Sec. 1 of C. 101, supra, is still in force, and counsel argue that the situation under the act of 1935 must, accordingly, be the same. But that does not follow. The act of 1935 clearly shows that a tax upon the premiums paid for policies like those in controversy should be collected, and the act, therefore, by implication, repeals all acts, or parts thereof, inconsistent therewith.

We do not by any means say that the question before us is free from doubt. The argument of counsel thereon is able. We start out, however, with the probable and almost undoubted proposition that the legislature in the enactment of 1897 never contemplated the tax demanded by the insurance department. Counsel do not argue this point, nor give it any weight, to which it is entitled. The difficulty is as to whether, notwithstanding that fact, the case requires the adoption of the rule of statutory construction mentioned in Pellish Bros. v. Cooper, 47 Wyo. 480, 38 P. (2d) 670, to the effect that a statute in general terms will ordinarily include matters not yet then in existence. We thought that in view of Sec. 1, Ch. 101, supra, the legislature definitely excluded group insurance, (having in mind, of course, the class written in the manner mentioned in the original opinion), and that, consequently, the rule of statutory costruction mentioned had no place herein. Giving all due weight to the arguments of counsel, we can come to no other conclusion at this time, and we might say that the point was given not only due consideration, but was given the

most careful study. We further mentioned the construction placed on the law by the executive department, and the act of 1935 amending Sec. 115-117, supra. When that act was passed, this action was pending. Can it fairly be questioned that the legislature had at least a doubt as to the scope of the law on the same subject in existence before that? And if the legislature had such doubt, should it be surprising that this court has also? And counsel know well the rule that taxing laws, in case of doubt must be construed in favor of the taxpayer. We think that the result reached by us was correct from a legal standpoint, and that, furthermore, substantial justice, under the circumstances, has been done between the parties in this case.

*Rehearing denied.*

KIMBALL, Ch. J., and RINER, J., concur.