[No. 28967. Department Two. July 27, 1943.]

C. C. HALL, *Appellant,* v. EIVIND ANDERSON, *Respondent.*[1]

*Caldwell, Lycette & Diamond,* for appellant.

*Henry Arnold Peterson,* for respondent.

ROBINSON, J.—In this action, the trial court sustained a general demurrer to the amended complaint. Plain-

[1]Reported in 140 P. (2d) 266.

tiff refused to plead further and appeals from the resulting judgment of dismissal, stating that the question involved is as follows:

"Where the complaint alleges that defendant, an experienced contractor, submitted the lowest and best bid for constructing a hospital in response to a United States advertised call for competitive sealed bids, and the defendant was ready to put up a surety bond required by law, and the government agents threatened to give the contract to a higher bidder; and where it is alleged that the contractor employed plaintiff, an attorney to go to Washington to try to persuade the War Department 'by legal means' to award the contract to defendant on the merits of the bid, the same being the lowest and best bid; and where the lawyer went to Washington and urged upon the War Department the propriety, fairness and justice of accepting on its merits the defendant's bid, and the contract was awarded to the defendant on his bid; is the agreement to pay the plaintiff attorney a contingent fee of one-half of one per cent illegal and void, so as to make the complaint demurrable?"

With this statement of the question involved, the respondent agrees, *provided* there be added thereto the following:

"Where the contingent fee consisted of certain percentage of the government contract to be obtained and where the government contract itself contained a covenant against contingent fees."

Respondent makes this addition because the contract which was entered into between the government and himself, a copy of which is attached to the amended complaint, contains the following:

"ARTICLE 12. Covenant against contingent fees.— The contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to terminate the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not

apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business."

In discussing this phase of the matter, respondent, Anderson, in his brief, assumes that his contract with Hall was concealed from the Government authorities, and even goes so far as to say:

"Appellant indeed accomplished an evil result in having Anderson's bid accepted and the contract awarded to him for under such circumstances Anderson obtained his contract from the government by deceit and subterranean methods and in direct violation of the terms of his contract with the government and appellant joined full fledged therein. For manifestly if Anderson was willing to resort to such means to get a contract from the government he should have been branded as being unworthy of any consideration whatever at the hands of the government, much less the awarding of a construction contract involving approximately a million dollars of construction work. Under appellant's own allegations it is plain he sacrificed the government in favor of himself and respondent, and being a member of the bar but intensifies the condemnation that should be meted out to him."

We have no facts before us other than those admitted by the demurrer. We, accordingly, do not know whether or not the Hall-Anderson contract was concealed from the government authorities. There is, of course, no allegation in the complaint to that effect. It seems to be the respondent's position that concealment must be assumed. It is said, in this connection, that, if the officers who contracted on behalf of the government had known of the Hall-Anderson contract, it would, manifestly, have been their duty not to award Anderson the contract. But why? Upon a thorough consideration of the whole matter, it might, for all we know, have appeared to them that Anderson's bid of $936,517 was so advantageous to the government that it was their duty to accept it, even though Anderson had agreed to

pay $4,682.50 for Hall's services. They could have accepted the bid and, upon the final settlement with Anderson, deducted the $4,682.50 from the contract price.

Neither do we know as a fact that Hall knew that such a provision as Article 12 would appear in the government contract when he made his agreement with Anderson, nor even that he learned of it when he arrived at Washington. Nor do we even know that Anderson knew that the contract would contain such a covenant until it was prepared and submitted to him for execution.

We make no suggestion as to what part Article 12 of the government contract might play, if any, in a trial of the action on its merits, but it is our opinion that, in ruling upon a general demurrer to the complaint, it can only be considered as indicating that the government wished to discourage contingent fees for securing contracts, except those which might accrue to "bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business." Article 12 of the government contract throws no light upon the question as to whether or not the contract sued upon is so far contrary to the public policy of the state of Washington that its courts should refuse to enforce it.

It seems desirable to set out the amended complaint rather fully since, in the consideration of the question involved, its language is all-important. After alleging that the plaintiff Hall is a practicing lawyer and the defendant Anderson a contractor, the amended complaint alleges:

"III. That shortly prior to April 8, 1941, the United States of America, through the War Department, advertised and called for competitive sealed bids for the construction of a 400-bed hospital system at Fort Lewis and the 41st Division Cantonment at Fort Lewis Military Reservation, in Pierce County, Washington. That in response to said call for bids, and within the time

provided, to-wit: On April 8, 1941, the defendant, Eivind Anderson, submitted a written bid to the United States of America, in conformity with the said call for bids, said bid being in the sum of $936,517.00; that the said bid of said defendant, Anderson, was the lowest bid and the best submitted in response to said call for bids; that notwithstanding said bid was the lowest bid and the best bid, and that said defendant, Anderson, was ready and willing to enter into a contract with the United States for the work covered by the said bid, and to file a proper and acceptable surety bond as required by law, the officers and agents of the United States threatened to refuse to award said contract to the said defendant, Anderson, and threatened to award said contract to a higher bidder.

"IV. That when said government officers failed to award said contract to the defendant, Anderson, then the said defendant, Anderson, on or about the 12th day of April, 1941, by oral agreement, employed the plaintiff, C. C. Hall, as his attorney to go to Washington, D. C., to interview the War Department for the purpose of endeavoring, by legal means, to urge and persuade the War Department to cause said contract to be awarded to said defendant, Anderson, in accordance with, and on the merits of, the bid of said defendant Anderson, said bid being the lowest and best bid submitted in open public competitive bidding on said job.

"V. That at the time of employing the plaintiff, as aforesaid, said defendant, Anderson, orally agreed with the plaintiff that if the plaintiff would make said trip to Washington, D. C. in connection with said contract, that the defendant, Anderson, would pay the plaintiff's expenses, and if said contract was awarded to the defendant Anderson, that the defendant Anderson would pay to the plaintiff as attorney's fees and compensation, a sum equivalent to one-half of one per cent of the amount of said contract bid; that the plaintiff immediately orally accepted defendant's said employment offer and proceeded to Washington, D. C. with the defendant, Anderson, and pursuant to said agreement the plaintiff proceeded to urge upon various members of the War Department the propriety, fairness and justice of accepting on its merits the defendant, Anderson's, said bid, and of awarding to said defendant the said contract; that after plaintiff had taken such action,

the contract covering said bid was awarded to the defendant, Anderson, on May 8, 1941, said contract being in the sum of $936,517.00, and said fee, to-wit: the sum of $4,682.50 became due and payable to plaintiff from the defendant, Eivind Anderson, . . ."

Reducing the complaint to its essentials and giving its allegations every reasonable intendment, as is the rule in passing upon a demurrer, the complaint amounts simply to this: Defendant, Anderson, a contractor, in response to an invitation or a call to bids by the Federal government, submitted a bid in conformity therewith and claimed the right to have the contract awarded to him, on the ground that it was the lowest and best bid. The government, however, was threatening to award it to another. He employed the plaintiff, Hall, a lawyer, to go to Washington to "urge and persuade" the war department to award him the contract, promising to pay a sum equivalent to one-half of one per cent of the bid if he succeeded. Hall went to Washington and urged upon various members of the war department "the propriety, fairness and justice of accepting on its merits the defendant, Anderson's, said bid." Defendant, Anderson, was awarded the contract, but refuses to pay the plaintiff the compensation agreed upon.

The respondent cites many cases to sustain his contention that the contract so pleaded is void as against public policy. If we were to accept and apply the broad, sweeping generalizations of the opinion of the supreme court of the United States in *Providence Tool Co. v. Norris,* 69 U. S. 45, 17 L. Ed. 868, upon which great reliance is placed by the respondent, we would be compelled to so hold; for, it is categorically said in that opinion that an agreement to procure a contract from the government to furnish it with supplies is subject to the same rule as contracts for compensation to influence legislation, and that "these [contracts to influence legislation] have been uniformly declared

invalid." If this was the law then (1865), it is no longer so. We are convinced, after an examination of the cases cited, that the writer of the note on "Validity of contract to influence administrative or executive officer or department" (46 A. L. R. 196) was correct in saying:

"In other words, the law only strikes down those contracts which contemplate the use of secret, sinister influences—those which contemplate that the support of the desired measure shall be secured as a favor from the legislator, induced by personal reasons or friendship, rather than by an appeal to the judgment. There is in reason more basis for upholding contracts to influence the various executive and administrative officers and departments than for upholding 'lobbying contracts,' so-called, particularly where (and this is the most common instance of such contracts) the contract is an employment to act as agent or representative in an endeavor to secure government contracts. This is true not only because the transaction is one in which an agent would commonly be employed were both principals, private individuals, but also because the official whose favorable action is sought—at least, if the employment is for the purpose of securing a government contract, or making a sale to the government —is charged with the specific duty of letting contracts or making purchases, and in a better position to judge the merits of the agent's proposal, and less likely to be susceptible to personal influence, than would be an individual legislator, who often would not have an opportunity to investigate the merits of a proposed measure. And while the courts often profess to test the validity of contracts to influence administrative officers by the same rules by which the validity of lobbying contracts are tested (see, for example, the reported case *Old Dominion Transp. Co. v. Hamilton, ante,* 186 [146 Va. 594, 131 S. E. 850, 46 A. L. R. 186]), the actual results reached indicate a greater tendency to uphold these contracts. And this is true notwithstanding the decision of the United States Supreme Court in *Providence Tool Co. v. Norris* (1865) 2 Wall. (U. S.) 45, 17 L. ed. 868, which in sweeping terms declared all agreements for compensation to procure government contracts void."

See, also, the reference to the *Norris* case in *Noble v. Mead-Morrison Mfg. Co.,* 237 Mass. 5, 129 N. E. 669. As to contracts to influence legislation, see note, 29 A. L. R. 157, on "Validity of lobbying contracts.".

Since the notes above cited are obtainable in nearly every law office, we will forbear the citation of a long list of authorities, but, as indicative of the general trend, the following representative cases may be noted: *Bergen v. Frisbie,* 125 Cal. 168, 57 Pac. 784, attorney's contract on contingent fee to procure a land patent from the department of the interior to which defendant claimed to be entitled by reason of compliance with the government's requirements; *Stansell v. Roach,* 147 Tenn. 183, 246 S. W. 520, 29 A. L. R. 143, contract of a layman on a contingent fee to secure legislation by Congress to reimburse contractors for loss on government contracts caused by the skyrocketing of wages and prices of materials by the breaking out of the first World War. In this case, it was understood from the beginning that the plaintiff would have to deal with the secretary of war and get the favorable consideration of the appropriation committees of the House and Senate and the vote of Congress itself. *Kemble v. Weaver,* 200 Iowa 1333, 206 N. W. 83, contract of attorneys to secure tax legislation favorable to a drainage district, executed by personal contact with every member of the legislature; *Williams v. Cave,* 138 Kan. 586, 27 P. (2d) 272, attorney's services for procuring the attorney general of the United States to dismiss an indictment; *Old Dominion Transp. Co. v. Hamilton,* 146 Va. 594, 131 S. E. 850, 46 A. L. R. 186, contract to induce the city of New York to cancel lease of a steamship pier, with no provisions made therein as to the means to be used. In all of the above cases, except the last, which was remanded on account of an erroneous instruction, the contract involved was upheld. This case is particularly valuable for its comprehensive treatment of the legal questions involved and its many citations. See, also, *Valdes v.*

*Larrinaga,* 233 U. S. 705, 58 L. Ed. 1163, 34 S. Ct. 750, and the opinion of this court in *State ex rel. Hunt v. Okanogan County,* 153 Wash. 399, 280 Pac. 31, 67 A. L. R. 668; also, a good general treatment of agreements to influence administrative officers and contingent compensation for securing government contracts in 12 Am. Jur. 709-712, §§ 206, 207.

The bound volume of the Washington session laws of 1943 has just come to hand. Beginning on page 907, and extending over many succeeding pages, is a list of appropriations, headed, "For the Relief of the Following Individuals, Firms and Corporations." Among them are such items as the following: $100 for the loss of a cow in a Bang's disease test; $210.76 in settlement of damage to fruit in fumigating carried on by the state department of agriculture; $1,750 for damage to trees by the same department; $955.50 with respect to personal damages inflicted by an attack of an inmate of a state mental hospital; $1,293 with respect to damages from an automobile collision with the equipment of the department of game; another for $390 for the same reason; $532 for loss of sheep due to the collapse of a bridge. These are but a few of many similar items, and they represent settlements, not appropriations for the payment of judgments which appear on page 913. These claims had to be properly presented to the appropriation committees of the Senate and House, and it was necessary that the members of the legislature be urged and persuaded that they should be allowed. No doubt many, perhaps most of these matters, were not presented by the claimants in person, but by attorneys or others employed by them to put the matter through the legislative mill, and it may be reasonably presumed that some of these agents were employed on a contingent fee basis. These were contracts of employment to influence legislation, and, in our opinion, were *prima facie* valid, despite the broad statement in *Providence Tool Co. v. Norris, supra,* that all contracts to influence

legislation are uniformly declared invalid. It will not do to hold that public policy forbids one to employ an agent to represent him in dealing with the government when, as far as the facts show, the employment contemplates an appeal to the government agency on the merits, as distinguished from the use of some species of direct or oblique personal influence.

In our survey of the case law on the subject, we find no better statement of the existing law than is contained in the opinion in *Noble v. Mead-Morrison Mfg. Co.*, 237 Mass. 5, 129 N. E. 669, a case involving the procurement of a munitions contract from the British government, from which we quote the following excerpts:

"   .   .   . It is a principle of the common law, indubitable in its soundness and inflexible in its application, that contracts will not be enforced directly or indirectly, but will be stricken down as void, which tend injuriously to affect the public welfare, or which promote the use of personal influence or extraneous pressure upon the conduct of public officials. Activities, not openly and straightforwardly presented as agent or attorney but disguised as disinterested or as founded upon zeal for the public good, cannot be the foundation for a successful action at law although resting upon an express promise of financial reward. A contract respecting public service and public welfare is illegal, which by its express terms, by its inherent tendency, or by the means necessarily or by fair implication to be employed in its execution, requires the performance of acts corrupt in themselves or inclining toward the pollution of public or private honesty and integrity of purpose.   .   .   .

"The general principle fairly deducible from the decisions is that ordinarily no one factor is decisive in determining whether the contract concerning furnishing supplies to the government is void as contrary to public policy. Contingency of compensation upon success, percentage upon the amount involved in sales directly to the government, and the size of the fee, all are elements entitled to consideration. The words 'contingent compensation' in connection with a contract

may be used either in an obnoxious or in a harmless sense. The tenor of the contract may be such in connection with its setting as to stamp it with invalidity. If it bears any badge of fraud, either covertly or openly, it must be stricken down. The question of the legality of the contract in each case is to be determined by weighing all the elements involved and then deciding whether its inherent tendency is to invite or promote the use of sinister or corrupt means to accomplish the end or to bring influences to bear upon public officials of any other nature than the single one of genuine advantage to the government. If such is its tendency, it must be pronounced illegal. . . .

*"On its face the contract upon which this action is founded did not import the use of illegal means. Its terms are innocent of any taint. The inference is not required that the plaintiff held himself out as possessing or that the defendant thought it was purchasing political or other influence. The conduct of the parties did not necessarily indicate the use of personal or political influence as the means by which the end aimed at by the contract was to be accomplished. . . .* The record taken as a whole shows that the question whether personal influence and official pressure were a part of the contract could not have been ruled as matter of law." (Italics ours.)

■ Upon the bare facts of this case, as fixed and determined by the amended complaint and the demurrer thereto, we think the contract pleaded cannot be held void, as a matter of law. We can see no real distinction between the contract pleaded and a contract, on a contingent fee, to urge and persuade the Federal department of the interior to issue a patent or, on a contingent fee, to persuade Congress to appropriate money to reimburse contractors for losses, or a contract to persuade the attorney general of the United States to dismiss an indictment, etc., or, to put the matter generally, we see nothing in the terms of the contract pleaded, or in its tendency, or in the means to be employed in its execution, which requires the performance of acts corrupt in themselves. The con-

tract could conceivably have been lawfully performed without engaging in any act or practice which was contrary to the public morals or the public welfare. In his brief, the respondent, in replying to appellant, says:

"Appellant on page 9 of his brief states: 'This is not a case where "personal influence," "undue influence," "political pull," "bribery," "sinister means" or "corruption" are used or involved.' With this Respondent does not agree. We are directly concerned in this case with personal influence. This Appellant agreed to use when he undertook to 'urge and persuade' the government."

Such a conclusion—assuming that the respondent, in making that statement, uses the words "personal influence" in the bad sense, in which sense only it is material to the inquiry—is an unwarranted assumption. The allegation of the complaint is that the defendant employed the plaintiff to "urge and persuade," nothing more. There is nothing sinister in employing an attorney to urge and persuade. Every attorney who comes to this court—and some are employed on contingent fees—is employed to do that very thing. If the respondent-defendant, in fact, employed the plaintiff to urge and persuade by use of bribery or political pressure, or some form of personal duress or other improper backstairs influence, that is a matter of defense which he must plead and prove. The court will not, by mere implication, find that the simple contract pleaded contemplated the use of unlawful means.

" 'The law does not presume that parties to a contract intend by it to accomplish an illegal object, but it rather presumes that they intended to accomplish a legal purpose.' " 2 Elliott on Contracts 341, § 1065.

" 'The law will not presume, unless forced to do so, that a person intends to do an illegal act. It will not, therefore, presume that the parties intended to make an illegal contract.' " *Richards v. Ernst Wiener Co.*, 207 N. Y. 59, 100 N. E. 592.

The judgment appealed from is reversed, and the cause remanded for further proceedings not inconsistent herewith.

SIMPSON, C. J., BEALS, and GRADY, JJ., concur.

BLAKE, J., dissents.

---

September 21, 1943. Petition for rehearing denied.