[No. 32221. Department Two. November 28, 1952.]

WILLIAM YORK, *Respondent*, v. GAASLAND COMPANY, INC., *Appellant.*[1]

[1]Reported in 250 P. (2d) 967.

*Brown & Millhouse*, for appellant.

*C. R. Burks* and *John A. Kellogg*, for respondent.

HAMLEY, J.—This is an action to recover compensation for services rendered in obtaining government contracts and locating needed construction materials.

Plaintiff, William York, is an experienced "expediter" who is acquainted with government officials in Washington, D. C. Defendant, Gaasland Company, Inc., is a corporation which was engaged in construction work for the Federal government in Alaska. The suit came to trial on the second amended complaint. This pleading set out five causes of action, only the first, second, and fourth of which are involved on this appeal.

The first cause of action pertains to an alleged contingent fee contract. Under this contract, according to the complaint, defendant agreed to pay plaintiff ten thousand dollars if plaintiff could secure for defendant a government contract for immediate construction of a certain road in Alaska. The second cause of action relates to alleged ser-

vices performed by plaintiff in obtaining, for defendant, government contracts for the construction of three airstrips in Alaska. The fourth cause of action involves alleged services performed by plaintiff in locating a large quantity of pipes and fittings needed by defendant's subcontractor on the Alaska work. With respect to the second and fourth causes of action, the demand is not for the recovery of agreed compensation, but for the reasonable value of the services, alleged to be fifteen hundred and one thousand dollars, respectively.

The jury returned a verdict for plaintiff in the sum of two thousand dollars on the first cause of action, one thousand dollars on the second cause of action, and five hundred dollars on the fourth cause of action. Judgment was entered accordingly, and defendant appeals.

Concerning the first cause of action, the assignments of error present several questions, one being whether the contingent fee arrangement sued upon is contrary to public policy and unenforcible.

Respondent's version of the facts pertinent to a consideration of this question may be briefly stated. In the spring of 1950, Gaasland Company, Inc., was engaged in performing a four-million-dollar construction contract for the United States government near Naknek, Alaska. Officers of the corporation believed that the construction of a certain eighteen-mile road between Naknek and King Salmon, Alaska, at a cost of about five hundred thousand dollars, would be beneficial to the corporation as well as the government. They therefore made an effort to obtain inclusion of this work in the corporation's contract with the government, but were initially unsuccessful.

On April 15, 1950, at a conference held in Bellingham, Washington, Roy Gaasland, president of the corporation, acting on behalf of the corporation, orally promised to pay William York ten thousand dollars if the latter could get the road work added to the contract. It was understood that nothing would be paid if York failed. The parties contemplated that York would attempt to obtain the contract

through solicitation and persuasion of responsible government officials in Washington, D. C.

Pursuant to this understanding, York spent twelve days in Washington, D. C., in late April and early May, 1950, and returned there again for a few days later in May. He conferred with many government officials and military officers and succeeded in enlisting the interest of two Pentagon generals and a top official in the department of the interior. He was finally told by the latter official that the corporation would get the road contract, provided it submitted a bid within reason, and the Alaska highway commission could arrange for the appropriation. This ended York's work on the road matter. He had received one thousand dollars from the corporation as an advance for expenses, two hundred fourteen dollars of which had been spent in entertaining government officials and military officers at various luncheons, dinners, and cocktail parties. The contract covering the road work was awarded to the corporation late in September, 1950.

In contending that this oral agreement for a contingent fee is contrary to public policy and unenforcible, appellant relies upon executive order No. 9001, promulgated by the president of the United States on December 27, 1941. This order contains the following provision:

"5. Every contract entered into pursuant to this order shall contain a warranty by the contractor in substantially the following terms:

"The contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to annul the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business." (Par. 5, Title II, Executive Order No. 9001, as amended, 6 Fed. Reg. 6787, 50 U. S. C. A. § 611, p. 676.)

Respondent, on the other hand, calls our attention to the fact that a warranty almost identical with that prescribed in executive order No. 9001 was considered in *Hall v. Anderson*, 18 Wn. (2d) 625, 140 P. (2d) 266, 148 A. L. R. 760, and was held not to vitiate a contingent fee agreement of this general nature.

In the *Hall* case, the question arose on a demurrer to the complaint. The complaint alleged that, on April 8, 1941, the defendant had submitted the lowest and best bid for the construction of a hospital at Fort Lewis, but that officers of the United States had threatened to refuse to award the contract to the defendant. On April 14, 1941, the defendant therefore arranged to have his attorney go to Washington, D. C., and by legal means urge and persuade the war department to award the contract to the defendant. The defendant agreed to pay the plaintiff's expenses and, as attorney's fees and compensation, a sum equivalent to one half of one per cent of the amount of the contract. The plaintiff went to Washington, D. C., on this mission, and the contract was awarded to the defendant on May 8, 1941. This government contract contained a warranty almost identical with that set out in executive order No. 9001, although executive order No. 9001 was not issued until more than eight months later.

Holding that the law strikes down only those contracts which contemplate the use of secret, sinister influences, we said:

"It will not do to hold that public policy forbids one to employ an agent to represent him in dealing with the government when, as far as the facts show, the employment contemplates an appeal to the government agency on the merits, as distinguished from the use of some species of direct or oblique personal influence. . . .

"We see nothing in the terms of the contract pleaded, or in its tendency, or in the means to be employed in its execution, which requires the performance of acts corrupt in themselves. The contract could conceivably have been lawfully performed without engaging in any act or practice which was contrary to the public morals or the public welfare." (pp. 634-5)

In the earlier case of *Goodier v. Hamilton*, 172 Wash. 60, 19 P. (2d) 392, which apparently was not cited by either counsel in the *Hall* case, and was not referred to in the latter opinion, we held unenforcible an agreement to pay an insurance agent one thousand dollars if the latter would take the defendant to an attorney who could secure a certificate of convenience and necessity from the state department of public works. There was no evidence that the parties contemplated improper means to obtain the authorization, or that such means were used. Nevertheless, we affirmed a judgment for the defendants, saying:

"However, the agreement of the parties is of such a nature that such means might have been used. It is within the realm of contemplation that a contract of this nature would readily suggest to one desirous of securing a highly compensatory result, to employ means which the law, good morals and public policy do not sanction. To anticipate and prevent a subversion of a proper administration of justice, the law should make it impossible for any such temptation to be carried into fruition by condemning a contract that contains the germ of possible corruption." (p. 63)

The criterion in both the *Hall* case and the *Goodier* case was the same: If the contract is inherently corrupt, it is void as a matter of law. In determining whether or not a contract is inherently corrupt, however, we seem to have applied a less stringent test in the *Hall* case than in the earlier *Goodier* case. In the *Hall* case, we stated that a contract was not inherently corrupt if it "could conceivably have been lawfully performed," while in the *Goodier* case we held that a contract should be condemned if it "contains the germ of possible corruption." However, in view of what is said below, we are not here called upon to determine which of these two tests is the proper one to be applied in determining whether a contract is inherently corrupt.

The contingent fee contract here was entered into after the promulgation of executive order No. 9001, and comes before us after two United States circuit courts of appeal have construed that order as a declaration of public policy. See *Bradley v. American Radiator & Standard Sanitary*

*Corp.,* 6 F. R. D. 37, affirmed 159 F. (2d) 39; *Mitchell v. Flintkote Co.,* 185 F. (2d) 1008.

In the *Bradley* case, the plaintiff was denied recovery on an agreement whereby he was to receive one quarter of one cent for each cast iron nose for incendiary bombs, manufactured under a government contract which plaintiff assisted in obtaining. It was specifically held that a contract entered into contrary to the warranty prescribed in the executive order "violates the Executive Order and is invalid as contrary to public policy."

In the *Mitchell* case, the plaintiff was denied recovery under an arrangement for a three per cent commission on any sales of camouflage paint sold by the defendant to the United States government. The plaintiff had assisted by finding out the government's wants in the camouflage field and promoting the defendant's reputation. The plaintiff sought to distinguish his case from the *Bradley* case, *supra,* since in the *Mitchell* case the goods were sold to the government only on competitive bids. This contention was rejected, the court stating that the proscription of contingent fee contracts "was intended to protect government agencies against corrupting influences," and competitive bidding does not completely safeguard this purpose. The court further stated:

"Executive Order No. 9001 is rigorous in its requirements. The Order flatly requires that no person be employed on contingent fee 'to solicit or secure' the contract. No exception is made for cases in which nothing sinister was contemplated or done under the terms of the contingent fee contract." (p. 1010)

In so construing this executive order, the court, in these Federal decisions, has taken cognizance of the fact that executive orders have the force of statute when made pursuant to congressional authorization (*Givens v. Zerbst,* 255 U. S. 11, 65 L. Ed. 475, 41 S. Ct. 227); that executive order No. 9001 was promulgated pursuant to statute (First War Powers Act, 55 Stat. 838, 839, approved December 18, 1941); and that statutory enactments are one of the sources

of public policy (*United States v. Trans-Missouri Freight Ass'n*, 166 U. S. 290, 41 L. Ed. 1007, 17 S. Ct. 540).

 The construction placed upon a Federal statute by a United States circuit court of appeals is entitled to great weight in the courts of this state, though it is not binding upon us if we do not deem it logical or sound. *Home Ins. Co. v. Northern Pac. R. Co.*, 18 Wn. (2d) 798, 140 P. (2d) 507, 147 A. L. R. 849. We are not persuaded that the Federal court decisions referred to above, construing this executive order as a declaration of public policy, are illogical or unsound. In our view, the public policy, as so declared, ought to be respected by the courts of this state.

 We accordingly hold that the oral contingent fee agreement in question is contrary to public policy and unenforcible. Appellant must therefore prevail with respect to the first cause of action.

The second cause of action, as previously indicated, is for the recovery of the reasonable value of respondent's services in connection with the letting of contracts to appellant for the construction of three airstrips in Alaska. It is alleged in the second amended complaint that, on May 25, 1950, appellant was engaged in the performance of three construction contracts for the United States government; that the plans and specifications had originally called for the construction of three airstrips as part of the work; that, when the contracts were let to appellant, these airstrips had not been included; that Gaasland requested respondent to go to Washington, D. C., and attempt to get the airstrips reincorporated as part of the work specified under the then-existing contracts; that respondent did so, was successful, and the reasonable value of his services was fifteen hundred dollars.

Appellant advances several reasons why the one-thousand-dollar judgment which was entered against it on this cause of action should be set aside. It is urged, first, that York could not possibly have been working in May, 1950, to have the government reincorporate the airstrips into then-existing contracts, because those contracts had not then

been let. In proof of this, appellant refers to a telegram from the government, dated July 1, 1950, advising appellant that its bid of June 20, 1950, had been accepted.

■ The complaint, as summarized above, refers to the reincorporation of the airstrips into "then existing" contracts in the performance of which appellant was then engaged. York's testimony at the trial, however, would warrant the jury in finding that, while appellant's bid on the main work was still pending, York was employed to urge government officials to open up the airstrip work for bidding. At the trial, appellant did not object to such testimony on the ground of variance from the pleadings. The pleadings will therefore be deemed amended to conform to the proof.

The second argument which appellant advances concerning the second cause of action revolves around an asserted substitute contract. Appellant denies that there was such an agreement. However, since respondent testified that such a substitute contract was entered into, whereby certain of appellant's obligations to York for services rendered were intended to be discharged, appellant argues that respondent must accept the legal consequences of his own testimony. Accordingly, appellant asserts, respondent's remedy, if any, is for breach of the substitute agreement.

There are two reasons why we believe this contention is without merit. The first is that the jury could have concluded, from the evidence, that only appellant's obligations in connection with obtaining the road contract were intended to be covered by the substitute agreement. The second reason is that, in any event, the ten thousand dollars which York was to pay into the corporation under the substitute contract was the same ten thousand he thought he had earned on the road contract deal. Since that agreement was contrary to public policy and unenforcible, York in effect had nothing to pay in to the corporation, and the substitute contract fails for want of consideration.

The third argument which appellant makes with regard to the second cause of action is that, under the evidence, there was an accord and satisfaction discharging the ob-

ligation. In support of this contention, the various sums paid by appellant to respondent are referred to, and respondent's failure to made demand for payment is emphasized.

■ Appellant pleaded accord and satisfaction as one of its affirmative defenses. The issue was submitted to the jury, being referred to in three of the trial court's instructions. Failure to make demand may indicate that there was a meeting of the minds on an accord and satisfaction. The jury, however, was not required to so conclude, and the verdict indicates that they did not. Likewise, the question of whether the sum actually paid was intended as payment of the obligation, or as reimbursement for expenses incurred, was for the jury.

The fourth argument presented by appellant in challenging the judgment on the second cause of action, is that its proposed instruction No. 8 should have been given. This instruction would have told the jury, in effect, that, if they found that respondent did not make demand for payment prior to bringing suit, the jury should consider that lack of demand and other circumstances in determining whether or not appellant's obligations had been satisfied by sums actually paid.

■ We do not think appellant was entitled to have the particular element of lack of demand emphasized in the manner proposed in this instruction. What, if any, consideration the jury should give to that element was a matter for counsel to present to the jury in discussing the weight to be accorded the evidence. The trial court did not err in refusing to give this instruction.

■ As a fifth argument against the second cause of action, appellant contends that respondent did not present any proof which could be considered by the jury in measuring the value of his services. We have examined the testimony and believe this contention to be without merit. We are also of the opinion that appellant's final argument, in which it is urged that appellant should be credited with $1,582 for expense money advanced and not accounted for, is not well

taken. This was a question of fact for the jury. No useful purpose will be served in setting out the detailed facts and contentions involved in these last two arguments.

The matters discussed above, relative to the second cause of action, also cover all arguments advanced regarding the fourth cause of action. As to both the second and fourth causes of action, we therefore conclude that the trial court did not err.

The judgment is reversed and remanded, with directions to dismiss the first cause of action with prejudice, and enter judgment for respondent on the second and fourth causes of action in accordance with the verdict of the jury.

SCHWELLENBACH, C. J., HILL, FINLEY, and DONWORTH, JJ., concur.

