TRI–COUNTY ELECTRIC ASSOCIA-
TION, INC., Appellant
(Plaintiff below),

v.

The CITY OF GILLETTE, Wyoming, a
Municipal Corporation, Appellee
(Defendant below).

No. 4880.

Supreme Court of Wyoming.

Aug. 24, 1978.

Cecil K. Hughes, Sundance and David D. Uchner of Lathrop & Uchner, Cheyenne, signed the brief and appeared in oral argument on behalf of the appellant.

Thomas S. Smith of Smith, Stanfield & Scott, Laramie, signed the brief and appeared in oral argument on behalf of the appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

The plaintiff-appellant public utility (hereafter Tri-County), selling electricity, claimed in its declaratory judgment action filed in the district court that defendant-appellee City (hereafter Gillette), a municipality authorized to sell electricity to its inhabitants, was invading its territory. The district court found that Gillette had the "exclusive right to serve electrical customers

within the City of Gillette and to grant franchises within its boundaries." The trial court further found that Gillette "may take over Plainitiffs [sic] facilities only upon paying just compensation."

Tri-County on appeal frames the issues to be:

"(a) Whether the Certificate of Public Convenience and Necessity of August 15, 1960, comprised a vested property interest and whether the City of Gillette's action amounted to a taking thereof without just compensation.

"(b) Whether the territorial rights created by the contract of May 5, 1960, between Appellant and the City of Gillette could be unilaterally abrogated by the City's program of annexation.

"(c) Whether the City of Gillette's Ordinance No. 624 invested in it the power to restrict appellant's activity within the area certificated to Appellant."

We shall affirm.

The basic facts of this case have previously been before this court, *Tri-County Electric Association, Inc. v. City of Gillette,* Wyo.1974, 525 P.2d 3, but in a different posture. That case was on a petition for review of a decision by the Wyoming Public Service Commission (hereafter P.S.C.). This court there held that the questions sought now to be settled could not be adjudicated by the P.S.C. and were matters for relief in the courts and not the agency. It was further held in that decision that because of defective joinder of an equitable action for injunction with a petition for review, for technical reasons, Tri-County could not be enjoined by the district court in that proceeding from furnishing electrical service to areas annexed by Gillette. The reversal by this court in that earlier case specifically provided that it was without prejudice to Gillette to secure a full adjudication of all legal questions which might arise in a proper forum.

Gillette has since 1915 lawfully owned and operated its own electrical power utility. It buys power at wholesale and sells at retail. The profits from its sale of electrical energy to its inhabitants are used to supplement other revenues to meet budgetary requirements for municipal operations. Prior to 1961, the P.S.C. had regulatory jurisdiction over municipally owned utilities. In that year, § 37–1–101, W.S.1977 [1] was amended to exclude from the P.S.C. that jurisdiction within the corporate limits of a city.

On January 29, 1947, the P.S.C. issued its Certificate of Public Convenience and Necessity to Tri-County authorizing it to sell electricity to the inhabitants of Campbell, Crook and Weston counties, Wyoming, excepting communities then being served by an electric utility, which by its language excluded Gillette. Tri-County, according to its articles of incorporation and other data in the record, is an association organized to serve its members, not the public, and for the benefit of the rural community, pursuant to the Rural Electrification Act, 7 U.S.C. § 901 et seq., and is financed through loans from the Rural Electrification Administration of the United States. On May 5, 1960, Gillette and Tri-County entered into an agreement defining Gillette's service area in the immediate surrounding area of Gillette, generally on the basis that Gillette service "consumers which are by nature a part of the municipality, and the rural area surrounding be serviced solely and essentially by the Second Party [Tri-County]. *That this principle, however, shall not be considered a precedent for expansion in any direction in the future without further agreement by the parties.*" [2] (Emphasis added.) The parties then agreed upon a

---

1. Section 37–1–101(a)(vi)(H) now provides in pertinent part:

 "(H) None of the provisions of this chapter shall apply to interstate commerce except when a regulatory field has not been preempted by the United States government, nor to public utilities owned and operated by a municipality of the state of Wyoming, except as to that portion of such municipally owned and operated public utility, if any, as may extend services outside the corporate limits of such municipality * * *."

2. Excerpted from the preamble to the 1960 agreement.

purchase price for each other's facilities within overlapping areas, which the record shows has been paid.

At the time that agreement was entered into, "public utility" included a municipality, subject to regulation, § 37–1, W.S.1957, so Gillette applied to the P.S.C. for approval of the agreement between it and Tri-County and for issuance of a Certificate of Public Convenience and Necessity authorizing it to continue operations within the delineated area. The P.S.C. by order of approval in pertinent part directed:

"3. That a certificate of Public Convenience and Necessity be and the same is hereby issued to the Town of the City of Gillette, Wyoming authorizing it to continue to operate and maintain its electric utility system and *to extend the same from time to time as and when it becomes necessary for the purpose of furnishing electric utility service to the public within its corporate limits* and the fringe and rural area surround [sic] said municipality, as described in our Findings herein, at its presently filed and effective tariff rates; and * * * " (Emphasis added.)

Since that agreement was entered into, Gillette has undergone the impact of phenomenal growth due to mineral development within the surrounding region. The population of Gillette in 1960 was about 3,000; at the time of trial it was estimated to be 12,200. Oil and mineral extraction caused some growth ultimately starting in 1969 but the real force struck in 1973 as a result of coal mining development. Exhibits in the record include twelve separate ordinances of Gillette annexing as many parcels of land to the City between June, 1969 and August, 1975, inclusive. In 1970, Tri-County applied to the Gillette City Council for an easement across city property preparatory to furnishing electric service to the Pioneer Addition, an area apparently located outside Gillette's territory as described in the 1960 agreement and Certificate of Convenience and Necessity. As shown by city council proceedings, "The Council declined to grant any easement to any supplier of services in which the City of Gillette has pre-empted that particular service field."

Thereafter in July, 1970, the city council passed an ordinance providing that no person or corporation shall construct any electrical power line or furnish electric power without first having obtained a franchise from the City to do·so,[3] relying on § 4, Article XIII, Wyoming Constitution:

"No street passenger railway, telegraph, telephone or electric light line shall be constructed within the limits of any municipal organization without the consent of its local authorities."

Tri-County, relying on what it considered to be vested rights by virtue of its contract of June, 1960, and the P.S.C. Certificate of Convenience and Necessity of the same year, nevertheless went ahead and constructed electric lines and facilities and

---

**3.** Ordinance No. 624, passed and approved on July 10, 1970:

"Section 1: That no person, corporation or other entity, shall construct any telegraph, telephone or electric power line within the limits of the City of Gillette as it now exists or may be hereafter enlarged, without first obtaining from the City Council a franchise to do so.

"Section 2: No person, corporation or other entity, shall delivery [sic] or perform any utility services, such as but not limited to, the supply of electric energy within the City of Gillette without first obtaining from the City Council a franchise to do so.

"Section 3: Each day of violation of this ordinance shall constitute a separate offense and be punishable as hereinafter provided.

"Section 4: Violation of this ordinance shall constitute a misdemeanor punishable by a fine of no more than $100.00 or imprisonment in the city jail for a term of not exceeding 30 days for each offense.

"Section 5: The City Council finding that the spirit of this ordinance has already been violated and that a continuing threat for further violation exists, emergency is hereby declared and this ordinance shall be in full force and effect from and after its passage and approval.

\* \* \* \* \* \* "

We will make no holding in this case approving or disapproving the propriety, form, or content of such an ordinance. We shall consider it only as part of the facts and circumstances leading up to the litigation between Gillette and Tri-County.

commenced its electrical service to persons it solicited as members within what the City considered a forbidden area. As we understand it, Tri-County is also serving electricity in other subdivisions, the exact extent and details of which do not appear. No prosecutions were undertaken under the ordinance. The case is now before us in that attitude.

In summary, we will hold that Gillette has authority by proper eminent domain proceedings to take property of Tri-County within its municipal boundaries, for the purpose of expanding its electric distribution system; Gillette's and Tri-County's territorial rights subsist only by action of the P.S.C. and applicable statutes, not by contract; upon annexation, any rights of Tri-County terminate in the annexed area, except as to those members of its association served at the time of annexation, pursuant to § 4, Article XIII, Wyoming Constitution; Tri-County is not authorized to serve within the corporate limits of Gillette without its consent, except to the extent just stated, which right cannot be taken away except by condemnation. We do not in this action and appeal decide any questions pertaining to just compensation except to hold that whenever Gillette takes property of Tri-County for public use, it must pay just compensation in accordance with the law pertaining to eminent domain and consistent with applicable holdings in this case; and, the matter of the mortgages of the United States on Tri-County's property is properly an issue in condemnation proceedings where the United States may be made a party.

 When a municipality is in the business of selling electricity, it is acting in a proprietary, not governmental, capacity.

When a municipality engages in the business as an electric utility for a profit,[4] it is in competition with private enterprise and should be treated no differently than the latter. *Frank v. City of Cody,* Wyo.1977, 572 P.2d 1106; *Town of Pine Bluffs v. State Board of Equalization,* 1958, 79 Wyo. 262, 333 P.2d 700.

Next, we can eliminate any issue of compensation which might be payable by Gillette to Tri-County, because of the admissions of Gillette stated with a generously broad brush in its brief:

> "Appellee cannot in good conscience burden this court with an attempt to rebutt [sic] the respectable authorities quoted by appellant, since appellee agrees that appellant does indeed possess a property right in its facilities which have heretofore been constructed within what is now the municipal boundary of appellee, and acquiesced in that premise in the lower court; however, the extent of such property right and the value thereof was not at issue in the lower court, and indeed is not the subject of this appeal. Further, it is erroneous to assert that the lower court failed to consider this valuable right and it is an unequivocal inaccuracy to suggest that the lower court held that appellee can take over appellant's certificated area without being bound to pay any compensation therefor. The lower court could not have stated its holding more clearly when it stated that appellee;
>> "'may take over Plaintiff's (appellant's) facilities only upon paying just compensation.'"

Later in its brief, Gillette further announces that "it is the present intention of appellee [Gillette] to preempt appellant's

---

4. The agreed statement of facts and testimony in the record discloses that profits from the sale of electricity by Gillette, which go into the general fund for other city services such as street lighting and maintenance, sewer and water service, garbage collection, police and fire protection, is estimated at between 25 and 40 percent per annum. However, in the year of the trial, because of electrical expansion paid for in cash, though there would be a paper profit, no cash would be available for other city services. When Gillette realizes revenue from the electrical system for the benefit of the city's other activities, an area within the city served by Tri-County would share in that benefit but not be contributing through charges for electrical service for such benefits. The City at the time of trial was collecting maximum taxes that could be legally levied.

[Tri-County's] right to serve the annexed areas."

 That admission eliminates Tri-County's first issue. It is clear that Gillette admits that it is taking or at least attempting to take for municipal purposes areas or parts of areas assigned by exclusion to Tri-County by virtue of the 1960 P.S.C. certificate. When we examine Tri-County's Amended Complaint and its prayer,[5] the claim of Tri-County is somewhat clarified. The issue coming into focus is whether Gillette has a right in its proprietary capacity to take over—to preempt—areas which had been in 1960 delineated for Tri-County by the P.S.C., by exclusion, from a described service area for Gillette within its exterior boundaries plus a fringe and rural area outside its corporate limits. We conceive that issue to include whether Gillette, in its proprietary role, has the power of eminent domain over Tri-County's franchise from the State [6] and facilities located within its municipal boundaries, as extended from time to time, under the circumstances of this case; and if so, what are the respective rights of Gillette and Tri-County in that regard within the controversial territory?

 A city has authority to exercise the right of eminent domain. Section 15–1–103(a)(xxxiii), W.S.1977.[7] The procedure for condemnation provided by that section has been superseded by later legislative enactments prescribing that Rule 71.1, W.R. C.P. will be followed. See §§ 1–26–101 and 1–26–108, W.S.1977, referred to later in this opinion. No one questions the authority of Gillette to operate its electric distribution system, a right acquired during the evolution of municipally owned electric light and

5. Prayer of Tri-County's Amended Complaint:
 "1. That the respective rights of the parties in and to the area annexed to Defendant City be determined.
 "2. That the Plaintiff be adjudged to have the sole right to furnish electric power and energy within its certificated area as granted by the Wyoming Public Service Commission.
 "3. That the Court adjudge the contract attached hereto as Exhibit F to be a good valid contract and the Defendant be required to comply with its terms and conditions.
 "4. That the Court grant such other and further relief as it deems just and proper in the premises, pursuant to Sections 1–1049—1–1064, Wyoming Statutes, 1957.
 "5. For costs herein, and for such further relief as the Court deems proper."

6. The parties in this case refer to Tri-County's Certificate of Convenience and Necessity as well as any rights accruing to Tri-County as a result of the 1960 Certificate of Convenience and Necessity issued to Gillette as a franchise from the State. We do not consider that terminology inappropriate. Franchises are special privileges conferred by the government on individuals, which do not belong to the citizens of the country generally of common right; no franchise can be held which is not derived from the law of the state. *The People's Railroad Co. v. Memphis Railroad Co.,* 1869, 77 U.S. 38, 10 Wall. 38, 19 L.Ed. 844, 848–849. A "franchise" is a special privilege emanating from the government by a legislative grant and vested in an individual person or in a body politic or corporate. *Thomas v. Daughters of Utah Pioneers,* 1948, 114 Utah 108, 197 P.2d 477, 507. Generally speaking, a "franchise" is a grant of a special privilege by public authority, the main

element of which is the permission to do something which otherwise the grantee would not have a right to do. *In re Southern Nebraska Power Co.,* 1923, 109 Neb. 683, 192 N.W. 317, 319. As applied, for example, the tax on insurance companies based on gross premiums is a "privilege" or "franchise tax." *Equitable Life Assur. Society of the United States v. Thulemeyer,* 1935, 49 Wyo. 63, 75, 52 P.2d 1223, 1226, reh. den. 54 P.2d 896. Couched in archaic terms, a franchise is:
 " 'A royal privilege or branch of the king's prerogative, subsisting in the hands of a subject. Being, therefore, derived from the crown, it must arise from the king's grant; or, in some cases, may be held by prescription, which, as has been frequently said, presupposes a grant.' " *Cain v. City of Wyoming,* 1902, 104 Ill.App. 538, 540, quoting from Blackstone.
 We conclude that the grant of a Certificate of Convenience and Necessity is the grant of a franchise to do business and provide a service in a particular, designated area.

7. Section 15–1–103(a)(xxxiii), W.S.1977, grants a city authority:
 "To exercise the power of eminent domain, and take property for public use within and without the city limits for the purpose of erecting or establishing public buildings, streets, alleys, cemeteries, *or for any other necessary or authorized public purpose.* In all cases the person whose property is taken or injured shall be adequately compensated as determined in district court proceedings in the manner provided for condemnation by railway companies; " (Emphasis added.)

power systems.[8] We hold it to be an "authorized public purpose."

In addition to § 15–1–103(a)(xxxiii), supra, a general statute also authorizes the exercise of eminent domain by a municipal corporation. Section 1–26–101, W.S.1977.[9] It was held by this court in *Town of the City of Newcastle v. Toomey,* 1958, 78 Wyo. 432, 329 P.2d 264, 76 A.L.R.2d 525, that when a municipal corporation undertakes to exercise its right of eminent domain, the procedure to be followed is prescribed by the predecessor [10] to the foregoing statutory section. The only change since then was enacted by the Wyoming legislature during a general revision of Title 1, W.S., § 1, Chapter 188, Session Laws of Wyoming, 1977. By § 1–27–101 of that act (§ 1–26–101, W.S.1977), Rule 71.1, W.R.C.P. was substituted in the place of the procedure prescribed for railroad corporations.[11]

To further converge eminent domain authority of a municipality upon the specific type of property with which we are here concerned, there is other statutory authority to condemn. Section 1–26–104, W.S. 1977, provides that:

"Any incorporated city or town of this state may acquire by condemnation, purchase or gift the franchise and the plant, facilities, equipment and property of any person or entity owning or operating in the city or town a franchise and plant, facilities, equipment or other property used or intended for the purpose of supplying or furnishing to the public of the city or town any public utility service mentioned in W.S. 1–26–105."

Section "W.S. 1–26–105" there referred to provides:

"For the purposes of W.S. 1–26–104 through 1–26–109 'public utility service' means and includes communication or transmission of intelligence or messages by telephone service; electricity for light, heat, power and like purposes; natural or artificial gas for heat, light, power and like purposes; steam for heat, power and like purposes; or water for municipal, domestic, agricultural, irrigation, manufacturing and like purposes."

It is then provided by § 1–26–106:

"The purpose for which the franchise and plant, facilities, equipment or other prop-

---

**8.** The first enabling act authorizing cities and towns to establish electric plants to supply electric lights and power was enacted in 1907. Chapter 92, Session Laws of Wyoming, 1907. The authority is one of the powers of cities and towns. Section 15–7–101(a)(v), W.S.1977:

"To establish, maintain and regulate electric light plants and electric power plants to supply the inhabitants with electric lights and power, to light the streets, highways and public buildings, and supply power for water works and other municipal [municipally] owned works and utilities."

The power to do so also appears in § 1–26–106, W.S.1977, which provides:

"The purpose for which the franchise and plant, facilities, equipment or other property may be acquired is for municipal ownership or operation of the business by the city or town, which right is hereby given to any incorporated city or town."

In the 1965 revision of statutes pertaining to cities and towns, Chapter 112, Session Laws of Wyoming, 1965, the right of cities and towns to operate electric light and power plants and systems is recognized by §§ 426 through 436 thereof, now §§ 15–7–201 through 15–7–212, W.S.1977, and Chapter 26, Title I, W.S.1977. By Chapter 78, Session Laws of Wyoming, 1933, now § 1–26–105, infra, cities were granted the power of eminent domain to acquire

electric power plants and facilities. See *Jensen v. Town of Afton,* 1943, 59 Wyo. 500, 143 P.2d 190.

**9.** Section 1–26–101, W.S.1977:

"The state, or any county or municipal corporation may purchase or acquire by condemnation any real estate including streets, alleys or public highways, as sites for public buildings or for any other necessary public purpose, and take therein the fee simple absolute. The power of condemnation shall be exercised as prescribed by Rule 71.1, Wyoming Rules of Civil Procedure. Proceedings in condemnation shall be conducted in the name of the state, county or municipal corporation and by the attorney general when for the state, the county attorney when for the county and the municipal attorney when for a municipal corporation."

**10.** Section 3–6001, W.C.S.1945.

**11.** The procedure to be followed is repeated in § 1–26–108:

"Except as herein modified, the procedure for the condemnation provided for in W.S. 1–26–104 through 1–26–109 shall be the same as provided by the Wyoming Rules of Civil Procedure."

erty may be acquired *is for municipal ownership or operation of the business by the city or town, which right is hereby given to any incorporated city or town.*" (Emphasis added.)

Once the city is in the business of supplying electricity to its inhabitants, it has a continuing right to condemn by § 1-26-107:

"Any incorporated city or town of this state has the further right to acquire by condemnation, purchase or gift any real estate or other property, public or private, whether within or outside the corporate limits of the city or town, for rights-of-way, sites, buildings or other purposes connected with or necessary to carry on the business of municipal ownership or operation of any public utility service, or to secure outside connections for any public utility service."

■ We hold that Gillette has the clear right to condemn through eminent domain proceedings property of others including that of other utilities, necessary to carry on its public utility service of furnishing electrical service.

■ Since the right of eminent domain in Gillette is so imminently present, we must dispose of the effect, if any, the contract between Gillette and Tri-County may have upon the respective rights of the parties within the areas with which we are concerned. We are satisfied that within its language the contract has been completely executed. Its force was expended when the P.S.C. issued its 1960 Certificate of Convenience and Necessity to Gillette. There is no performance further required.

At the time the agreement was entered into, the P.S.C. had jurisdiction over Gillette, both within and without its corporate limits by virtue of § 37–1, W.S.1957, which defined a public utility as including a municipality. As pointed out heretofore in this opinion and in *Tri-County Electric Association, Inc. v. City of Gillette,* supra, that was changed by amendment, § 3, Chapter 44, Session Laws of Wyoming, 1971, which took from the P.S.C. jurisdiction over

" * * * public utilities owned and operated by a municipality of the State of Wyoming, except as to that portion of such municipality owned and operated public utility, if any, as may extend services outside the corporate limits of such municipality * * *."

Gillette was thus thereafter inoculated from control by the P.S.C.

■ At no time in the statutory history of municipal ownership and operation of an electric utility has a Wyoming city or town had authority to grant or deny the right to any utility to serve areas outside its corporate limits. That jurisdiction has been and still is solely vested in the P.S.C. As we view the agreement between Gillette and Tri-County, it was no more than a stipulation for the consideration of the P.S.C. in its authority to regulate service by public utilities. The parties to the agreement recognized that authority by a specific provision of their 1960 agreement which stated: "9. That the entire agreement between the parties hereto is subject to final approval and authorization by the Wyoming Public Service Commission to the extent of their jurisdiction in the matter." Rather than taking their problems of territory and service to the P.S.C. for resolution following a hearing wherein the facts are developed by testimony and other types of evidence, the parties made it easy for that regulatory body; without the approval of that body neither party had any freedom to act. This court has held that the P.S.C. has the power to amend a certificate of public convenience and necessity, following hearing or "upon agreement of the parties." *Riverton Valley Electric Association v. Pacific Power and Light Company,* Wyo.1964, 391 P.2d 489, 500; *Svilar Light and Power, Inc. v. Riverton Valley Electric Association, Inc.,* Wyo. 1960, 355 P.2d 52. The P.S.C. is authorized in the event of a conflict between two utilities to make such order and prescribe such conditions as seem just and reasonable, *Dubois Telephone Exchange v. Mountain States Telephone & Telegraph Co.,* Wyo. 1967, 429 P.2d 812, citing § 37–31, W.S.1957,

now § 37–2–205(a), W.S.1977.[12] Apparently, Gillette and Tri-County were interfering with each other and by agreement submitted the matter for official adjustment.

At the time the 1960 agreement was entered into and acted upon by the P.S.C., § 37–61, W.S.1957[13] was in effect and in pertinent part provided:

> "Every public utility shall file with the commission copies of such contracts, agreements or arrangements with other public utilities to which it may be a party, as the commission may designate, and every public utility when and as required shall exhibit to the commission a copy or the original of any contracts, agreements or arrangement with any person. * * "

At that time, § 15(1), Rules of the Public Service Commission, effective August 1, 1958, provided that, "Every utility must file one copy of all special contracts entered into governing the sale by it of public utility service. * * * "

 The agreement was swallowed up by and disappeared into action thereafter taken by the P.S.C. Once the agreement was acted upon by the Public Service Commission, it had served its purpose and had no independent status as between the parties that would grant any perpetually exclusive right of Tri-County to serve an area coming within the corporate limits of Gillette. "Perpetuities and monopolies are contrary to the genius of a free state, and shall not be allowed. * * * " Section 30, Article I, Wyoming Constitution.[14] The

general rule is that agreements between utilities to divide territory are invalid on the ground of public policy, 64 Am.Jur.2d, Public Utilities, § 27; Anno., 70 A.L.R.2d 1326. Without the blessing of the P.S.C., the agreement was a nullity and could survive no further than the extent of that agency's approval. There was here no lawful contract that could extend beyond that authority resting exclusively within the P.S.C. Utilities cannot between themselves contract away the jurisdiction of the P.S.C. The contract created no territorial rights; whatever territorial rights came into being were created by the Certificate of Convenience and Necessity issued by the P.S.C. An interesting case in that connection is *Rural Electric Co. v. State Board of Equalization,* 1942, 57 Wyo. 451, 120 P.2d 741, reh. den., 57 Wyo. 451, 122 P.2d 189. The R.E.A. cooperative in that case attempted in the early history of such associations to avoid classification as a utility basing its claim on the form of contract it had with its customers. We repeat what this court in that case quoted approvingly: Contracts cannot be used as a "device to hoodwink the law." Contractual provisions cannot rise above constitutional and statutory law.

One aspect of the 1960 Certificate of Convenience which seems to be overlooked is that it was issued to Gillette, not Tri-County. It was, as indicated, based upon a lack of objection expressed in the 1960 agreement as we see it, a stipulation made for the use of the P.S.C. Tri-County's right in the area has its foundation in its own 1947 Certificate of Convenience and Necessity

---

12. Section 37–2–205(a), in pertinent part provides:

> " * * * If any public utility, in constructing or extending its line, plant or system interferes or is about to interfere with the operation of the line, plant or system of any other public utility already authorized or constructed, the commission on complaint of the public utility claiming to be injuriously affected, may after hearing make such order and prescribe the terms and conditions for the location of the lines, plants or systems affected, as to it are just and reasonable. * * * "

13. Since amended by § 1, Chapter 116, Session Laws of Wyoming, 1977, now § 37–3–111, W.S.

1977, to delete the words "such" and "with other public utilities."

14. This principle has also been enunciated in *Police Protective Association v. The City of Casper,* Wyo.1978, 575 P.2d 1146, cited by Gillette. That case is in a different context and inapplicable in the appeal before us, because here there is no intention expressed in the agreement that it be perpetual, was subject to approval by the P.S.C. and could not supersede the authority of that body, which by its 1960 order authorized Gillette to extend its electric utility system, when necessary to furnish electric utility service to the public within its city limits.

granting it the franchise to "serve electricity to the inhabitants of the counties of Campbell, Crook and Westion [sic], Wyoming, with the exception of the village of Osage, Wyoming and *those communities now presently served by an electric utility.*" (Emphasis added.) We do not urge, however, that the 1960 certificate did not also mark Tri-County's rural boundaries, as of that date, but with the right of Gillette to extend its boundaries, which had the effect of pushing away those of Tri-County.

Further supportive of the position of a lack of authority in the City is § 15–1–103, W.S.1977, in effect at the time the 1960 contract was entered into, providing for a city power

"(xxxi) (A) To grant franchises for such terms as the governing body deems proper, to electric light, telegraph, telephone, gas, water, television, radio, power, transportation, and steam companies, and other utility companies; to grant the privilege to install and maintain necessary installations provided by such companies under or over any streets, alleys, or avenues; to contract, for not exceeding ten (10) years, with any such electric light or gas companies for the necessary energy and service for the lighting of streets, public buildings or other requirements of the city or town;

"(B) *No franchise may be entered into with any individual, individuals, company or corporation whereby exclusive right shall be given to any individual, individuals, company or corporation for any purpose whatsoever.*" (Emphasis added.)

Even if Gillette could have lawfully granted some franchise to Tri-County outside its city limits, it could not have been of any exclusive nature precluding it from extending its own lines into its own subdivisions, regularly annexed.

 As pointed out in *Tri-County Electric Association, Inc. v. City of Gillette,* supra, the P.S.C. has only the power granted to it by the legislature. There is no question but that it has power over Tri-County. The legislature has practically absolute power over cities and towns, the pure type of municipal corporation, other than as prescribed by the so-called home rule amendment to the Wyoming Constitution, § 1, Article XIII not applicable here and any other constitutional provision to the contrary. A city or town can only exercise those powers expressly or impliedly conferred by constitution or statute. *City of Buffalo v. Joslyn,* Wyo.1974, 527 P.2d 1106; *Nation v. State ex rel. Fire Fighters Local 279, I. A. F. F.,* Wyo.1974, 518 P.2d 931; *Wyoming State Treasurer v. City of Rawlins,* Wyo.1973, 510 P.2d 301. The legislature is therefore the well-spring of practically all the powers here in play. The legislature has bestowed power on a city or town to operate an electric utility within its corporate limits, as expanded from time to time. The P.S.C. has had taken from it any power to function within the boundaries of a city in carrying out its assignment of utility regulation in granting territorial rights for utility service.

 By construing the 1960 contract as a stipulation for the use of P.S.C., we have given it lawful status. To give it any other recognition would establish it to be ultra vires and unlawful. It is a well settled principle that if a contract can be performed legally, it will be presumed by the court that the parties intended a lawful mode of performance. *Redke v. Silvertrust,* 1971, 6 Cal.3d 94, 98 Cal.Rptr. 293, 490 P.2d 805, cert. den. 405 U.S. 1041, 92 S.Ct. 1316, 31 L.Ed.2d 583; *Texas Rubber Supply, Inc. v. Jetslide International, Inc.,* Tex.Civ. App.1971, 470 S.W.2d 270, reh. den.; *Weiner v. Wilshire Oil Company of Texas,* 1964, 192 Kan. 490, 389 P.2d 803; *W. R. Hall Transportation and Storage Company v. Gunnison Mining Company,* 1964, 154 Colo. 72, 388 P.2d 768; *Hall v. Anderson,* 1943, 18 Wash.2d 625, 140 P.2d 266, 148 A.L.R. 760.

It is a further long-standing policy of the law to interpret contracts whenever reasonable and possible in such a way as to uphold them. *Shattuck v. Precision-Toyota, Inc.,* 1977, 115 Ariz. 586, 566 P.2d 1332; *Stangl v. Todd,* Utah 1976, 554 P.2d 1316; *Mohr Park Manor, Inc. v. Mohr,* 1967, 83 Nev. 107, 424 P.2d 101, 31 A.L.R.3d 513; *Don Johnston*

*Drilling Co. v. Howard,* Okl.1959, 347 P.2d 640, 78 A.L.R.2d 824, reh. den.; *Morgan v. Firestone Tire and Rubber Co.,* 1948, 68 Idaho 506, 201 P.2d 976; *Public Market Co. of Portland v. City of Portland,* 1942, 171 Or. 522, 130 P.2d 624, 138 P.2d 916; *Tallman v. Smith,* 1944, 112 Colo. 217, 148 P.2d 581. It is the duty of courts to sustain the legality of contracts when fairly entered into, if reasonably possible to do so, rather than to seek loopholes and technical legal grounds for defeating their intended purpose. *Eastern Distributing Co., Inc. v. Flynn,* 1977, 222 Kan. 666, 567 P.2d 1371. It will not be supposed that the parties entered into a contract contemplating an act amounting to a violation of the law and will be construed as intending something for which they had the power to contract. *Barham v. Barham,* 1949, 33 Cal.2d 416, 202 P.2d 289, reh. den. It is therefore, a more reasonable interpretation of the agreement and one that avoids making it void to hold that it was prepared in contemplation only for action by the P.S.C. and was intended to be nothing more.

It is important to pinpoint the time when Tri-County's right to serve the disputed areas ended and Gillette's right began, because that will control the territory of Gillette and Tri-County from time to time. The normal trend of a city is to build and expand; so, therefore, anyone claiming electric utility rights pertaining only to rural territory entering areas contiguous to a city does so with notice that the municipality will very likely expand and is subject to that event. *City of Brookings v. Brookings Lake Telephone Co.,* 1970, 85 S.D. 96, 177 N.W.2d 489, reh. den.; *Town of Coushatta v. Valley Electric Membership Corp.,* La. App.1962, on reh. 139 So.2d 822; *Farmers Electric Co-op. Corp. v. Arkansas Power and Light Co.,* 1952, 220 Ark. 652, 249 S.W.2d 837, reh. den.

 We note, again, that the P.S.C. was aware of that need for foresight when it approved a circumscription of Gillette's 1960 territory authorizing it to maintain its utility system and "* * * to extend the same from time to time as and when it becomes necessary for the purpose of furnishing electric utility service to the public within its corporate limits * * *." In *Utah Gas Service Company v. Mountain Fuel Supply Company,* 1967, 18 Utah 2d 310, 422 P.2d 530, it was perceptively observed that the responsibility imposed upon a Public Service Commission of regulating utilities in the public interest is a continuing one; it is unwise and impractical to assume that a Commission intends to grant sight unseen a permanent and exclusive franchise for the indefinite future over a large area such as three counties, without reflection upon the changing conditions of growing populations and communities. That is particularly true in Wyoming where the legislature and the State Constitution, § 4, Article XIII have given cities extensive control over electric utilities within their boundaries.

 Yet, Gillette's right to govern the new territory is not based upon any contractual relationship with Tri-County, it is an attribute of governmental power granted to the municipality by the State. When new territory is brought into the city, its ordinances and any pertinent state statutes immediately go into effect in the new area it has annexed. *Western Gas Co. of Washington v. City of Bremerton,* 1944, 21 Wash.2d 907, 153 P.2d 846. Therefore, once the area is annexed and until such time as Tri-County receives a franchise from Gillette, it is not entitled to extend its service to other than those members of its association served at the time of annexation. *City of Brookings v. Brookings Lake Telephone Co.,* supra; *Unity Light & Power Co. v. City of Burley,* 1968, 92 Idaho 499, 445 P.2d 720, reh. den.; *Pee Dee Electric Membership Corporation v. Carolina Power & Light Company,* 1961, 253 N.C. 610, 117 S.E.2d 764; *Town of Gans v. Cookson Hills Electric Cooperative,* Okl.1955, 288 P.2d 707; *Dixie Electric Membership Corp. v. City of Baton Rouge,* 5th Cir. 1971, 440 F.2d 819.[15]

---

15. Some states enacted legislation specially pertaining to Rural Electrification Act cooperatives. For example, see *Resh, Inc. v. Oklahoma Electric Cooperative,* Okl.1973, 516 P.2d 803,

In force in 1960, was what is now § 15–1–510, W.S.1977:

"The territory and inhabitants of any annexed area shall be subject to all the laws, ordinances, rules and regulations of the city or town to which they are annexed and shall be entitled to all the rights, privileges and franchise services afforded the inhabitants thereof including fire protection, sanitary facilities and utility service. *In the event the inhabitants of the city or town are furnished any utility service by the city or town or under franchise, the annexed area shall receive the same service."* (Emphasis added.)

■ With the array of statutes we have cited favoring the position of Gillette, there comes to mind one more applicable rule in the law of contracts. Laws which subsist at the time and place of making a contract, and where it is to be performed, enter into and become a part of it as though expressly referred to and incorporated in its terms. *Application of Hagood,* Wyo.1960, 356 P.2d 135.

Tri-County takes the position that Gillette had some sinister motive in annexing subdivisions as it did and its true purpose was to invade Tri-County's utility territory. We can find from the record no such bad faith. Gillette was caught in the bind of a population explosion. Subdivisions were created and clamoring for annexation in order to obtain police and fire protection, utility services of all kind (sewer, water, garbage, electricity) and those benefits flowing from municipal government. The evidence is uncontradicted that subdivisions were annexed only upon application of the subdividers or their occupants.

The third issue raised by Tri-County has to some extent been peripherally answered by what we have heretofore said. Tri-County asks whether Ordinance No. 624

invested Gillette with any power to restrict Tri-County's activity within the area certified to it. The choice of the words "invested Gillette with any power" is not quite appropriate, nor expressive of its effect. We must collate the ordinance with the 1960 Certificate of Convenience and Necessity. It will be recalled that in our earlier discussion, we emphasized that Tri-County was by that certificate not given any permanent franchise to the geographical areas covered, or any other sort of a franchise in conflict with the rights of Gillette to enlarge its boundaries. The certificate was issued to Gillette and not Tri-County and specifically anticipated expansion.

■ All the ordinance did was give notice to the world, including Tri-County, that it intended to continue serving electricity to its inhabitants in accordance with the authority originally granted to it by the P.S.C. and then by statute. The ordinance gave the City no new rights within its corporate limits—it had acquired those by statute and § 4, Article XIII, Wyoming Constitution, supra.

■ There is a miscellaneous matter to be disposed of. What disposition should be made of Tri-County's mortgages to the Rural Electrification Administration of the United States? That is not a matter for determination in this proceeding. The mortgages are not a part of the record though the fact of their existence is not in dispute. Neither party saw fit to join that agency nor did it see fit to intervene. Tri-County appears to argue that the federal agency has an interest in the instant case. This action was filed by Tri-County. Its failure to join the United States is a waiver of any claim of a defect of parties unless indispensable. *Pickett v. Associates Discount Corporation of Wyoming,* Wyo.1967, 435 P.2d 445. In the absence of any cogent

reh. den. Prior to the enactment of such legislation, the Oklahoma Supreme Court held as we do here, *Caddo Electric Cooperative v. State,* Okl.1964, 391 P.2d 234, that the cooperative has only authority to continue to serve its members on its preannexation distribution lines, but had no authority to thereafter install

new lines within the new city limits. We also find that *City of Mesa v. Salt River Project Agricultural Improvement and Power District,* 1962, 92 Ariz. 91, 373 P.2d 722, reh. den., cited by both parties here is inapplicable for similar reason—controlling statutes not a part of Wyoming law.

authority or enlightenment by Tri-County, we cannot see that the United States is, at this point, indispensable. We cannot in this action foreclose any rights of the absent United States, Rule 19(b), W.R.C.P., nor do we purport to.

The United States, through the Rural Electrification Administration, will be an indispensable party when Gillette in any separate proceeding undertakes to condemn property of Tri-County and take it through eminent domain proceedings. It is at that time the United States may be joined [16] and is entitled to protect its interest in Tri-County's property upon which it has a mortgage. The instant action takes no property; it only affirms Gillette's right to proceed by appropriate eminent domain action to do so. We decide the case under the Wyoming Constitution and statutes enacted by the Wyoming State Legislature. Many of the statutes cited require payment of just compensation. Section 33, Article I, Wyoming Constitution's hallowed commandment is that: "Private property shall not be taken or damaged for public or private use without just compensation."

Affirmed.

ROSE, Justice, specially concurring, in which McCLINTOCK, Justice, joins.

I concur in the majority's result, but I am unable to subscribe to the manner and method by which it is reached.

First, I fail to see why an extended discussion of the City's power of eminent domain is necessary. My inquiry tells me that the appellant is not challenging the City's power to condemn the utility's property. That is not in issue here. Tri-County's concern is with the question of just compensation, which the majority properly finds was not an issue in this proceeding. We should, therefore, be addressing our attention only to the effect of the parties' 1960 agreement and the subsequent P.S.C. Certificate of Convenience and Necessity.

Secondly, with regard to the real issue in this case, I would have simply found that neither the 1960 agreement, nor the P.S.C. Certificate, purported to grant to Tri-County the perpetual and exclusive right to service the areas in question. Both documents—and especially the P.S.C. Certificate—expressly recognize that the definitions of service-area boundaries contained therein were subject to the power of the City of Gillette to extend its electric system. Even if these writings could somehow be construed to grant some type of exclusive franchise to Tri-County, I would have, nevertheless, found that the contract between the parties could, at most, be construed to continue in force only at the will of the parties and to be terminable upon reasonable notice. *Police Protective Association of Casper v. City of Casper*, Wyo., 575 P.2d 1146. As for the P.S.C. Certificate, it would have been my judgment that the P.S.C. lost jurisdiction over services within the City's corporate limits, as extended by annexation, by virtue of the statutory amendment now contained in § 37–1–101(a)(vi)(H), W.S.1977.

---

16. 28 U.S.C. § 2410:

"(a) Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter—

\* \* \* \* \* \*

"(4) to condemn, or

\* \* \* \* \* \*

"real or personal property on which the United States has or claims a mortgage or other lien."